# EXHIBIT A

RUN DATE: 04/29/2020 Bexar County Centralized Docket System Pg: 1  PGM: DKB4900P

RUN TIME: 11:26:48                                              JCL: DKJCASER

_____

# * D O C K E T   I N F O R M A T I O N *

CAUSE NUM: 2020CI06275

DATE FILED: 03/27/2020          COURT: 166        UNPAID BALANCE:      0.00

TYPE OF DOCKET: OTHER CONTRACT

### * * * S T Y L E * * *

WG MONTERRY VENTURE LLC

VS DORNIN INVESTMENT GROUP LLC

ACCOUNT TYPE:                 ACCOUNT NO:

ACCESS: D                     STATUS: PENDING

LIST TYPE: C

## * L I T I G A N T   I N F O R M A T I O N *

| SEQ | LAST /FIRST /MIDDLE NAME | LIT. TYPE/ATTORNEY | DATE |
|-----|-------------------------|--------------------|------|
| 00001 | WG MONTERREY VENTURE LLC | PLAINTIFF | 03/27/2020 |
|  |  | 00001 STAMMEL, MATTHEW R |  |
| 00002 | DORNIN INVESTMENT GROUP LLC | DEFENDANT | 03/27/2020 |
|  |  | 00003 SWANTNER, MATTHEW J |  |
| 00003 | DIG MONTEREY VILLAGE LLC | DEFENDANT | 03/27/2020 |
|  |  | 00003 SWANTNER, MATTHEW J |  |

## * S E R V I C E S   I N F O R M A T I O N *

| SEQ | SERVICE TYPE / DATES | DIST | LITIGANT NAME |
|-----|----------------------|------|---------------|

## * A T T O R N E Y   I N F O R M A T I O N *

| SEQ | DATE FILED | BAR NBR. | NAME | STATUS | DATE |
|-----|-----------|----------|------|--------|------|
| 00001 | 03/27/2020 | 24010419 | STAMMEL, MATTHEW R | SELECTED | 03/27/2020 |
| 00002 | 04/27/2020 | 18111075 | SHAPIRO, ROBERT J | SELECTED | 04/28/2020 |
| 00003 | 04/27/2020 | 24066169 | SWANTNER, MATTHEW J | SELECTED | 04/29/2020 |
| 00004 | 04/27/2020 | 24079668 | ZUREK, ZACH | SELECTED | 04/29/2020 |

## * P R O C E E D I N G   I N F O R M A T I O N *

| SEQ | DATE FILED | REEL | IMAGE | PAGE COUNT |
|-----|-----------|------|-------|------------|
| 00001 | 03/27/2020 | 0000 | 0000 | 0000 |
|  | DESC: PETITION |  |  |  |
| 00002 | 04/27/2020 | 0000 | 0000 | 0000 |
|  | DESC: LETTER TO DISTRICT CLERK |  |  |  |
|  | FROM: ROBERT J SHAPIRO RE: PROPOSED ORDER |  |  |  |
| 00003 | 04/27/2020 | 0000 | 0000 | 0000 |
|  | DESC: COUNTERCLAIM |  |  |  |
|  | AND ORIGINAL ANSWER OF DIG MONTERRERY VILLAGE LLC AND DORNIN INVESTMENT GROUP LLC |  |  |  |

RUN DATE: 04/29/2020 Bexar County Centralized Docket System Pg: 2  PGM: DKB4900P
RUN TIME: 11:26:48                                                  JCL: DKJCASER

**T R I A L     I N F O R M A T I O N**

| SEQ | DATE FILED | COURT | SETT. DATE | TIME | ATTY |
|-----|------------|-------|------------|------|------|

**O R D E R     I N F O R M A T I O N**

| SEQ | DATE FILED | JUDGE NAME | VOLUME | PAGE | PAGE CNT | AMOUNT | SOF |
|-----|------------|------------|--------|------|----------|--------|-----|

**B O N D     I N F O R M A T I O N**

| SEQ | DATE FILED | PRINCIPAL |
|-----|------------|-----------|

FILED
3/27/2020 9:16 AM
Mary Angie Garcia
Bexar County District Clerk
Accepted By: Annabelle Kung

## 2020CI06275

CAUSE NO. _____

| | | |
|---|---|---|
| WG MONTERREY VENTURE LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BEXAR COUNTY, TEXAS |
| | § | |
| DIG MONTEREY VILLAGE, LLC, | § | **166TH** |
| and DORNIN INVESTMENT GROUP, | § | |
| LLC | § | _____ JUDICIAL DISTRICT |
| | | |
| *Defendants.* | | |

### PLAINTIFF'S ORIGINAL PETITION

Plaintiff WG Monterrey Venture LLC ("**Plaintiff**" or "**Seller**") files this Original Petition complaining of Dornin Investment Group, LLC ( "**Dornin**" or "**Purchaser**") and DIG Monterey Village, LLC ("**DIG**,"), and would respectfully show the Court the following:

### I.      NATURE OF ACTION

1.      This lawsuit arises from Purchaser's failure and refusal to close on the sale of the multi-family property known as the Echelon at Monterrey Village.  Purchaser was supposed to close on March 26, 2020, with time being of the essence.  Because Purchaser failed to close, and Seller was ready, willing, and able to close, Seller is entitled to the Earnest Money provided by contract.  Seller brings this suit for the Earnest Money, together with its costs and fees.

### II.      DISCOVERY CONTROL PLAN

2.      Plaintiff  intends to conduct discovery under Level 2 pursuant to Rule 190 of the Texas Rules of Civil Procedure.

### III.      PARTIES

3.      Plaintiff is a foreign limited liability company, organized under the laws of Delaware.  Plaintiff owns the property in Texas that is the subject of this lawsuit.

**PLAINTIFF'S ORIGINAL PETITION – Page 1**

4.      Dornin and DIG are both limited liability companies, organized under the laws of Delaware and doing business in the State of Texas.  Dornin can be served with process by and through the Texas Secretary of State.  DIG can be served with process by and through DIG's registered agent, Lawyer's Aid Service, Inc., 505 West 15th Street, Austin, Texas 78701.

## IV.      JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over Dornin and DIG because they have purposefully availed themselves of the benefits and protections of this forum by doing business in Texas, including by entering into an agreement for the purchase of property located in Texas. They also contractually agreed to jurisdiction in Texas for any proceeding arising out of the transaction that forms the basis of this lawsuit.

6.      This Court has subject matter jurisdiction over this matter because the amount in controversy is in excess of the minimum jurisdictional threshold for this Court.

7.      Venue is proper in Bexar County, Texas because this suit involves real property located in Bexar County.  TEX. CIV. PRAC. & REM. CODE § 15.0111.  Venue is also proper in Bexar County, Texas because a substantial part of the events or omissions giving rise to this suit have occurred in Bexar County.  TEX. CIV. PRAC. & REM. CODE at § 15.002(a)(1).

## V.      FACTS

A.      **Seller and Purchaser Enter into the PSA and Purchaser Proceeds with Due Diligence.**

8.      Seller and Purchaser entered into the Purchase and Sale Agreement dated as of January 6, 2020 (the "**Original PSA**"), concerning the sale of the Echelon at Monterrey Village located in the City of San Antonio, Texas (the "**Property**").  The parties amended the Original PSA with the "**First Amendment to Purchase**" dated as of January 27, 2020.  The agreed upon purchase price for the Property was $38,000,000.00.  Dornin entered into an Assignment

Agreement with DIG on January 29, 2020, but remained jointly and severally liable under the Original PSA, as amended by the First Amendment to Purchase.

9.      Pursuant to Section 2.3 of the Original PSA, Purchaser deposited $500,000 in Earnest Money with the escrow agent on or about January 8, 2020, and deposited another $500,000 in Earnest Money with the escrow agent on or about February 12, 2020 (the "**Earnest Money**").

10.     The First Amendment to Purchase established the Closing Date of the transaction as March 11, 2020.  The Purchaser, though, pursuant to Section 4 to the First Amendment to Purchase had "the right upon written notice to Seller . . . to extend the Closing for one period of fifteen (15) days upon depositing with the Title Insurer the sum of Two Hundred Fifty Thousand and 00/100 Dollars . . ." (the "**Extension Deposit**").

11.     Pursuant to this right, Purchaser gave notice to Seller by letter dated March 3, 2020, that "Purchaser has elected to extend the Closing Date for a period of fifteen (15) days, and accordingly, the Closing Date is . . . extended until March 26, 2020."  Purchaser further informed Seller in the same letter it would deliver the Extension Deposit on March 11, 2020.

12.     Despite this promise, Purchaser failed and refused to deliver the Extension Deposit.  Instead, Purchaser changed its position and contended that the Extension Deposit was not due until the time of Closing.  Although Seller disagreed with Purchaser's position, it relied on Purchaser and agreed to move forward to Closing, with the Extension Deposit to be paid at Closing.  As of the date of this Pleading, Purchaser had not delivered the Extension Deposit.

13.     Section 4.3 of the Original PSA established that a Due Diligence Period would take place ending on January 27, 2020.  The parties agreed that, at any time during the Due Diligence Period, and in fact "for any reason or for no reason whatsoever," Purchaser had the

right to terminate the PSA under Section 4.6 of the Original PSA.  Seller and Purchaser together extended this Due Diligence Period to February 10, 2020 in the First Amendment to Purchase.

14.     During the Due Diligence Period, Seller provided Purchaser with a variety of information about the Property, including recent rent rolls which reflected the rents due from each tenant.  During the Due Diligence Period, Purchaser had access to Seller's rent rolls through the "Yardi" software system.  The system was accessible at an any point during this time, and in fact Purchaser accessed it many times.

**B.     Purchaser Proceeds with the Transaction Following the Due Diligence Period Despite the Hubert Lease.**

15.     The Property has over 200 tenants.  At any given time, Seller is engaged in attempts to enter into new leases or otherwise renew leases of existing tenants.  The time between execution of the Original PSA and the scheduled Closing was no different.

16.     Under Section 7.2 of the Original PSA, the Purchaser and Seller agreed that "in no event shall Seller alter, amend, modify, supplement or extend the term of any Lease or enter into any new Lease upon terms other than as provided on **Schedule 7.2** . . . without Purchaser's prior written consent."  Seller and Purchaser negotiated this language of Section 7.2 to avoid, according to an email exchange between the parties on December 30, 2019, "a situation where seller charges big upfront fees and gives units away for free leaving us stuck with year leases way below market."  The same section of the Original PSA also emphasized that "Seller shall continue to operate and lease the Property in the ordinary course of business and consistent with past practice."

17.     Well before the Original PSA was executed, and in accordance with its ordinary course of business and consistent with past practices, Seller made offers to existing tenants to

renew their leases.  The aggregate renewal offers were more favorable than the amounts otherwise provided in Schedule 7.2.

18.     As part of its due diligence regarding the potential transaction, Purchaser reviewed the leases to which Seller was a party.  During the Due Diligence Period, on or about February 5, 2020, Purchaser raised to Seller that the Renewal Lease of Kyle Hubert (the "**Hubert Lease**") was for $100 less a month than agreed upon in Schedule 7.2 to the Original PSA.  Seller explained that the offer was made prior to the Original PSA execution date of January 6, 2020.  The Hubert Lease was signed on January 21, 2020 and the renewal rate was published on the Yardi system beginning on January 22, 2020.  However, despite having access to the system and clearly being aware of the renewal rate difference prior to the close of the Due Diligence Period, Purchaser did not terminate the PSA pursuant to Section 4.6 during the Due Diligence Period.

19.     In fact, in a letter dated February 10, 2020, Purchaser informed Seller that Purchaser was making the affirmative election to proceed with Closing under Section 4.6 of the Original PSA.

### C.     Purchaser Fails to Close.

20.     On March 18, 2020, Purchaser sent a letter to Seller stating that it did not intend to close the transaction.  Purchaser wrote it was "exercising its rights under Section 10.2 of the PSA" to terminate the agreement because Seller's renewal of "certain leases, including the Hubert Lease" was "an event of default which is not subject to cure." Under Section 10.2 of the Original PSA, only if "default or failure is not cured [by Seller] within ten (10) business days after delivery of written notice" was Purchaser entitled to remedy for the alleged default.  This 10 day period had not expired when, on March 18, 2020, Purchaser alleged the supposed default was uncurable.

21.     On March 20, 2020, Seller responded to this letter reminding Purchaser that it had been made aware of the renewal of the Hubert Lease prior to extending the Closing Date, but failed to raise the concern at that time.  Seller also made an offer to cure the default Purchaser alleged, despite there being no default or obligation to cure.  Seller demanded that "Purchaser close in accordance with the PSA."

22.     Seller has fully performed all of its duties and obligations under the Original PSA and First Amendment to Purchase, and no Event of Default by Seller has occurred.  Seller was ready, willing, and able to close on the Closing Date.  All requirements and conditions precedent to Purchaser's obligation to close under the Original PSA and First Amendment to Purchase have been performed or have occurred.

### VI.     DECLARATORY RELIEF UNDER THE UNIFORM DECLARATORY JUDGMENTS ACT

23.     Seller re-alleges the preceding paragraphs as if fully set forth herein, and seeks a declaratory judgment.

24.     Purchaser did not close the sale in accordance with the terms of the Original PSA and First Amendment to Purchase.

25.     Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Seller seeks a declaratory judgment that:

a)   No Event of Default by Seller has occurred;

b)   All requirements and conditions precedent to Seller's right to exercise the Closing of the Sale under the Original PSA and First Amendment to Purchase have been performed or have occurred;

c)   Purchaser has failed to close on the sale;

d)   Seller is entitled to the $1 million in Earnest Money;

e) Seller is entitled to another $250,000 as the Extension Deposit due from Purchaser; and

f) For reasonable and necessary costs and attorney's fees as are equitable and just.

## VII.  COUNT I – PROMISSORY ESTOPPEL

26.     Seller re-alleges the preceding paragraphs as if fully set forth herein, and sues Purchaser for promissory estoppel.

27.     Purchaser promised Seller it would provide Seller with the Extension Deposit on March 11, 2020.  Specifically, Purchaser promised it would provide Seller with the deposit amount in exchange for exercising its right to extend the Closing Date for 15 days past the original Closing Date of March 11, 2020.  The promise was made directly to Seller by Purchaser, in the letter dated March 3, 2020.

28.     Seller reasonably and substantially relied on the promise of Purchaser to its detriment by allowing Purchaser to extend the Closing Date an extra 15 days.  In addition, after Purchaser failed and refused to deliver the Extension Deposit, contending that the Extension Deposit was not due until Closing, Seller continued to rely on Purchaser's promise and agreed to move forward to Closing, with the Extension Deposit to be paid at Closing.

29.     Seller's reliance on Purchaser's promise was foreseeable.

30.     As Purchaser has now failed to Close, injustice can only be avoided by enforcing Purchaser's promise to pay the Extension Deposit.

## VIII.  COUNT II -- BREACH OF CONTRACT

31.     Seller re-alleges the preceding paragraphs as if fully set forth herein, and in the alternative sues Purchaser for breach of contract.

32.     The Original PSA and First Amendment to Purchase constitute a valid contractual relationship between the Purchaser and Seller, under which Purchaser agreed to pay the purchase price, or if Purchaser breached to pay the Earnest Money.

33.     Purchaser breached its contractual obligation to Seller by failing to Close with Seller on March 26, 2020.

34.     Seller has fully performed all of its duties and obligations under the Original PSA and First Amendment to Purchase.  All requirements and conditions precedent to Seller's right of recovery of the Earnest Money owed under the Original PSA have been performed or have occurred.

35.     Seller has made demands on Purchaser to Close.  As of the date of the filing of this Original Petition, Purchaser has failed to Close. In addition, Purchaser has failed to remit payment of the unpaid amounts owed to Seller.

36.     As a direct and proximate result of Purchaser's breach of the PSA, Seller has sustained actual damages and is owed the Earnest Money.  In addition to the Earnest Money, Seller is also entitled to recover certain other amounts, including, but not limited to, the Extension Deposit.  The Extension Deposit was required to be paid under the Original PSA and First Amendment to Purchase if Purchaser exercised its right to extend the Closing Date, which it did.  Under Sections 9.1 and 10.1 of the Original PSA, Seller is entitled to recover the Earnest Money and Extension Deposit.

37.     Seller is also entitled to recover pre-judgment and post-judgment interest as provided by state law.  The damages sought by Seller are within the jurisdictional limits of this Court.

38.     As a result of Purchaser's breach of the Original PSA and the First Amendment to Purchase, Seller has had to retain the undersigned attorneys to collect the outstanding amounts due and to represent it in this lawsuit.  Pursuant to Chapter 38.001(8) of the Texas Civil Practice and Remedies Code, Seller is entitled to recover from Purchaser its costs and reasonable attorneys' fees and expenses incurred in this lawsuit, including appeals, if any.  Seller has performed all requirements and conditions precedent to recovering attorneys' fees.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Seller prays that Purchaser be cited to appear and answer herein and that Seller has judgment against Purchaser for the following:

(a)     Declaratory judgement as set out;

(b)     Specific performance of Purchaser's promise;

(c)     In the alternative, actual damages in the form of Earnest Money, as a result of Purchaser's breach of the Original PSA and the First Amendment to the Purchase, along with the Extension Deposit;

(d)     post-judgment interest as provided by law from the date of judgment until paid;

(e)     pre-judgment interest as allowed by law;

(f)     reasonable attorneys' fees and expenses;

(g)     all costs of court; and

(h)     such further relief to which Seller may be justly entitled.

Dated:  March 27, 2020.

Respectfully submitted,

VINSON & ELKINS LLP


*/s/ Matthew Stammel*
Matthew R. Stammel
  State Bar No. 24010419
Emalee H. LaFuze
  State Bar No. 24110897
2001 Ross Avenue, Suite 3700
Dallas, TX  75201-2975
Telephone:    214.220.7700
Facsimile:    214.220.7716
E-mail:        mstammel@velaw.com
                elafuze@velaw.com

***Attorneys for Plaintiff WG Monterrey Venture LLC***



*Direct Phone*: (972) 388-5165
*Email*: rshapiro@canterburylaw.com

April 27, 2020

Via E-File

Honorable Mary Angie Garcia
Bexar County District Clerk
101 W. Nueva, Suite 217
San Antonio, Texas 78205-3411

   Re: Cause No. 2020CI06275; *WG Monterrey Venture, LLC v. DIG Monterey Village, LLC and Dornin Investment Group, LLC*; pending in the 166th Judicial District Court, Bexar County, Texas

Dear Ms. Garcia:

   Please allow this letter to serve as a formal request for entry of an Agreed Order Granting Substitution of Counsel in the above entitled and numbered cause of action. Please present the Agreed Order to the Judge for consideration.

   Thank you for your assistance in this matter.

     Respectfully yours,

     *Robert J. Shapiro*

     Robert J. Shapiro

/bc
Attachment (e-filing)

cc: All Counsel of Record (via E-Filing)

CAUSE NO. 2020CI06275

| | | |
|---|---|---|
| WG MONTERREY VENTURE, LLC | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | 166th JUDIDCIAL DISTRICT |
| DIG MONTEREY VILLAGE, LLC and | § | |
| DORNIN INVESTMENT GROUP, LLC | § | |
| | § | |
| Defendants | § | BEXAR COUNTY, TEXAS |

## AGREED ORDER GRANTING SUBSTITUTION OF COUNSEL

On this day came on to be heard the Motion of Matthew R. Stammel, Emalee H. LaFuze, and the law firm of Vinson & Elkins, LLP for the substitution of Robert J. Shapiro and the law firm of Canterbury, Gooch, Surratt, Shapiro, Stein & Jones, P.C. as counsel for Plaintiff WG Monterrey Venture, LLC. Counsel for Defendants has agreed to the Substitution of Counsel.

The Court finds that Robert J. Shapiro has certified that he has been retained by Plaintiff WG Monterrey Venture, LLC in this case and that the Motion should be granted. It is therefore,

ORDERED by the Court that Robert J. Shapiro and the law firm of Canterbury, Gooch, Surratt, Shapiro, Stein & Jones, P.C. shall be substituted as counsel of record for Plaintiff WG Monterrey Venture, LLC.

SIGNED _____, 2020.


_____
JUDGE PRESIDING

1

AGREED:


*/s/ Matthew Stammel*
Matthew R. Stammel, State Bar No. 24010419
mstammel@velaw.com
Emalee H. LaFuze, State Bar No. 24110897
elafuze@velaw.com
VINSON & ELKINS, LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Telephone: 214.220.7700
Facsimile:  214.220.7716


/s/ *Robert J. Shapiro*
Robert J. Shapiro, State Bar No. 18111075
rshapiro@canterburylaw.com
CANTERBURY, GOOCH, SURRATT, SHAPIRO,
STEIN, GASWIRTH & JONES, PC
4851 LBJ Freeway, Suite 301
Dallas, Texas 75244
Telephone: 972.239.7493
Facsimile:  972.490.7739


/s/ *Matthew J. Swantner*
Matthew J. Swantner, State Bar No. 24066169
mswantner@jw.com
Jackson Walker, LLP
112 East Pecan Street, Suite 2400
San Antonio, Texas 78205

FILED
4/27/2020 12:00 AM
Mary Angie Garcia
Bexar County District Clerk
Accepted By: Michael Yanas

CAUSE NO. 2020-CI-06275

| | | |
|---|---|---|
| WG MONTERREY VENTURE LLC | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| vs. | § | BEXAR COUNTY, TEXAS |
| DIG MONTERREY VILLAGE, LLC and | § | |
| DORNIN INVESTMENT GROUP, LLC | § | 166TH JUDICIAL DISTRICT |
| *Defendants.* | § | |

## DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now come DIG Monterrey Village, LLC and Dornin Investment Group, LLC, Defendants in the above numbered and styled cause (collectively, "Defendant" or "Purchaser"), and file this their Original Answer and Counterclaim for breach of contract, fraudulent inducement, promissory fraud, and failure of conditions precedent against Seller, WG Monterrey Venture, LLC ("WG," or "Seller"), and in support thereof respectfully show the following to the Court:

### I.     SUMMARY OF DISPUTE

1.     This is a fraud and breach of contract lawsuit involving a Purchase and Sale Agreement dated January 6, 2020 (the "Purchase Agreement") for the sale of the Echelon at Monterrey Village Apartments in San Antonio, Texas (the "Apartments"). Defendant, Dornin Investment Group, LLC, was the Purchaser, and Plaintiff, WG Monterrey Venture LLC, was the Seller.

2.     Before executing the Purchase Agreement, Seller provided Purchaser with information regarding the Apartments including a rent roll describing then current occupancy rates, rental rates, and Seller's determination of market rental rates for new leases and lease renewals. Notably, a copy of the December 31, 2019 rent roll for the Apartments containing Seller's representation of market rental rates was attached to the Purchase Agreement as Exhibit C.

3.      Because the purchase price for the Apartments was based on the market rental rates for new leases and lease renewals represented by Seller, Purchaser negotiated a schedule of minimum rental rates (the "Minimum Rental Rates"), which was attached as Schedule 7.2 to the Purchase Agreement, with Seller, which Minimum Rental Rates were the absolute floor rental rates for new leases or lease renewals to be effected by Seller prior to the close of escrow.

4.      Based on Seller's representations (which Purchaser later learned to be untrue) and Seller's agreement not to enter into any new lease or renew any existing Lease for a rental rate below the Minimum Rental Rates, Purchaser entered into the Purchase Agreement, opened escrow with a $500,000 earnest money deposit, and began a costly and time-consuming due diligence process.

5.      On January 27, 2020, based on the representations made by Seller to Purchaser to that point (which Purchaser later learned to be untrue), the parties entered into the First Amendment to the Purchase Agreement, which, among other things, served to waive all of Purchaser's conditions to close other than a pending tax issue with the county.  The First Amendment extended the Due Diligence Period to February 10, 2020 as it related only to the tax issue.  Because the Seller had successfully resolved the pending tax issue on or about February 10, 2020, Purchaser made the second earnest money deposit of $500,000.

6.      On or about February 4, 2020, after the parties executed the First Amendment on January 27, 2020 (pursuant to which Purchaser waived all conditions to close other than the aforementioned tax issue), Purchaser learned that Seller had sent out renewal notices to several tenants for the renewal of such tenants' leases at rental rates below the Minimum Rental Rates prior to entering into the Purchase Agreement (despite Seller's representation that the schedule of Minimum Rental Rates was based on Seller's currently offered rates) and that Seller had in fact entered into a lease renewals with a tenant named Hubert on January 22, 2020 (i.e. five days prior to January 27, 2020) for a rental rate below the Minimum Rental Rates in clear violation of Section 7.2 of the Purchase Agreement (the "Hubert Lease" and together with each of the other leases

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

entered into by Seller in violation of the terms of the Purchase Agreement, the "Offending Leases").  It should be noted that Seller had also received two additional Offending Leases signed by the applicable tenants, which were not disclosed to Purchaser until on or about February 18, 2020.  In light of Seller's decision to withhold such material information from Purchaser while inducing Purchaser to execute the Purchase Agreement and then the First Amendment affirm that Seller had no intention of honoring the terms of the Purchase Agreement at the time it was executed.

7.      At no time prior to the execution of the Purchase Agreement did Seller disclose to Purchaser the existence of the renewal notices for the Offending Leases.  And, at no time prior to Purchaser waiving its conditions to close "for any reason or no reason whatsoever" did Seller disclose to Purchaser that Seller had received/executed the Offending Leases.  Rather, Seller hid this critical information to induce Purchaser to execute the Purchase Agreement and then waive its conditions to close pursuant to the First Amendment.

8.      Had Purchaser known of the existence of the renewal offers for the Offending Leases, it would have never entered into the Purchase Agreement (or the First Amendment) in the first instance.  And, had Purchaser known that the market rental rates were actually decreasing despite Seller's representations otherwise, Purchaser would never have agreed to purchase the Apartments.  Seller's intentional misrepresentation of the market rental rates, its  unilateral decision to enter into the Offending Leases (notwithstanding the clear prohibition against doing so in Section 7.2 of the Purchase Agreement), and its decision to conceal this material information to Purchaser, were fraudulent in nature and constituted events of default under the Purchase Agreement.  Again, Seller fraudulently induced Purchaser to enter in to the Purchase Agreement based on fraud, deceit and false representations and thereafter fraudulently induced Purchaser to enter into the First Amendment by failing to disclose that it had entered into the Offending Leases at rental rates below the Minimum Rental Rates in violation of Section 7.2 of the Purchase Agreement.

9.      Based on Seller's fraud, its numerous breaches, and the multiple failures of conditions precedent to Purchaser's obligations under the Purchase Agreement, Purchaser sent Seller a Notice of Default and demand for the return of its $1,000,000 in Earnest Money on March 18, 2020.  Despite Seller's multiple breaches of the Purchase Agreement, its fraudulent conduct, and the multiple failures of the conditions precedent to Purchaser's obligations, Seller has refused to return the Earnest Money, which necessitated this Lawsuit.

## II.      GENERAL DENIAL

10.      Purchaser generally denies the allegations in Plaintiff's Original Petition.

## III.      VERIFIED PLEA

11.      Purchaser denies Seller's allegation that all conditions precedent have been performed or have occurred.  The specifics of this Verified Plea are described in the Causes of Action section below and are incorporated herein by reference.

## IV.      AFFIRMATIVE DEFENSES

12.      Fraud and Fraudulent Inducement, Deceit and Misrepresentation by Seller. Purchaser is not obligated to perform under the Purchase Agreement and is therefore not liable to Seller because Seller fraudulently induced Purchaser to enter into the Purchase Agreement and First Amendment based on Seller's fraud, deceit, and misrepresentation.  The specifics of this Affirmative Defense are described in the Causes of Action section below and are incorporated herein by reference.

13.      Equitable Estoppel.  Purchaser is not obligated to perform under the Purchase Agreement and is therefore not liable to Seller because Seller is equitably estopped from pursuing its claims.  Seller's claims arise from a real estate transaction in which Seller falsely represented to Purchaser that the occupancy rates, current rental rates, and anticipated market rental rates of the subject Apartments were better than they what they actually were.  Further, Seller's claims arise from a transaction in which Seller concealed that it had offered lease renewals with rental rents less than the Minimum Rental Rates agreed upon with Purchaser.  These concealed facts

4

were material to the transaction because Purchaser would not have executed the Purchase Agreement had it known that market rents on the Apartments were declining or that Seller had offered to renew leases at rental rates below the agreed upon Minimum Rental Rates.  Seller intended for Purchaser to act upon Seller's intentional misrepresentations and without knowledge of these concealed facts.  Seller knew or had the means of knowing the real facts.  Yet Purchaser neither knew nor had the means of knowing the real facts.  Purchaser substantially, reasonably, and detrimentally relied on Seller's misrepresentations and concealment.

14.    Failure of Consideration.  Purchaser is not obligated to perform under the Purchase Agreement and is therefore not liable to Seller because Seller failed to perform its material obligations under the Purchase Agreement.  The specifics of this Affirmative Defense are described in the Causes of Action section below and are incorporated herein by reference.

15.    Unclean Hands.  Purchaser is not obligated to perform under the Purchase Agreement and is therefore not liable to Seller because of Seller's wrongdoing for which Seller is attempting to benefit.  The specifics of this Affirmative Defense are described in the Causes of Action section below and are incorporated herein by reference.

16.    Purchaser is not obligated to perform under the Purchase Agreement and is therefore not liable to Seller based on any other avoidance or affirmative defense that discovery may yield.

## V.    COUNTERCLAIMS

### A.    FACTS

17.    As explained above, Purchaser - Dornin Investment Group, LLC, and Seller - WG Monterrey Venture LLC, entered into the Purchase Agreement for the purpose of Purchaser purchasing the Apartments from Seller.  A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit "A."**

18.    Seller's parent company, The Garrett Companies LLC, describes itself as "full service Multifamily Development, Construction, and Management team based in Greenwood,

Indiana . . . [whose] team of professionals work in unison to entitle, develop, build, and manage multifamily apartment projects across the country."

19.     Purchaser is a California-based "real estate investment firm that invests in commercial and residential real estate in partnership with a broad base of institutional and private investors."  After execution of the Purchase Agreement, Dornin Investment Group, LLC assigned the contract to its wholly owned subsidiary - DIG Monterrey Village, LLC, with the consent of Seller.

20.     On June 13, 2016, Seller obtained a $24,548,989 loan from BOK Financial for the construction of the Apartments.  Leasing began in the fall of 2017, and the Apartments were completed in 2018.  Importantly, Seller's loan from BOK Financial matured on June 10, 2019 – seven (7) months prior to Seller and Purchaser entering into the Purchase Agreement.

21.     Purchaser is informed and believes, and, on that basis alleges, that BOK Financial was forbearing on its enforcing of Seller's defaulted loan, but had expressly required Seller (its borrower) to find a buyer for the Apartments, and have that buyer remove contingencies, no later than January 31, 2020, in order for it to continue to forbear.  To that end, Seller retained Berkadia Proprietary Holding LLC ("Berkadia") as its broker to sell the Apartments so that Seller could repay the BOK Financial loan.  Furthermore, Purchaser is informed and believes, and, on that basis alleges, that at some time during the summer of 2019, Seller entered into an agreement to sell the Apartments with a buyer introduced to it by Berkadia, which such agreement was terminated some time prior to Berkadia introducing the Apartments to Purchaser.

22.     In the fall of 2019, Berkadia contacted Purchaser and introduced the Apartments to Purchaser as an "off-market deal."  By this time, Seller being significantly *past due* on the $24,548,989 BOK Financial construction loan and with the prior purchase agreement having been terminated, Seller desperately needed to sell the Apartments to pay off the loan.

23.     As discussions between the parties continued and *before* executing the Purchase Agreement, Seller provided two rent rolls (detailed spreadsheets with lease term, rent information,

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

and Seller's representation of what the "market rent" is for all of the units within the Apartments) to Purchaser — one for November 2019 and one for December 2019. Seller also provided Purchaser with a 12-month income statement for the period from December 2018 through November 2019. Based on this information, it appeared that rental income at the Apartments was stable and expected to increase over time.

24.      Also before executing the Purchase Agreement, Purchaser's counsel notified Seller of its concerns that Seller would lease units during the Due Diligence Period, for less than the market rates represented by Seller in the rent rolls. Purchaser's concern was due to the fact that the $38 million purchase price for the Property was based on Seller's representations of market rental rates for new leases and lease renewal. In an email dated December 30, 2019, Seller's General Counsel — Kyle McClammer — responded to Purchaser's concern by proposing a schedule of rents (which schedule was added to the Purchase Agreement as Schedule 7.2) to define the absolute floor rental rates that Seller could agree to in new leases and lease renewals. According to Mr. McClammer, Seller was comfortable "utilizing [Schedule 7.2] to define the floor for market rents" because the rental rates in Schedule 7.2 were "*based on [Seller's] currently offered [rental] rates and concessions*" [emphasis added] - despite the fact that Seller had already offered lease renewals for significantly less.  .  In other emails relating to this same issue, Mr. McClammer proposed that Purchaser provide "an updated rent roll [to Purchaser] just before expiration of the Due Diligence Period — that way, the [Purchaser's] team can review what new leases/lease amendments have been signed and the associated rental rates, and the [Purchaser] can decide whether to continue [with the purchase] based on that information." These proposals were accepted by Purchaser and incorporated into the Purchase Agreement as Section 7.2 and Schedule 7.2.

25.      In relevant part, Section 7.2 states "in no event shall Seller alter, amend, modify, supplement or extend the term of any Lease or enter into any new Lease upon terms other than as provided on Schedule 7.2 (attached hereto) without Purchaser's prior written consent."

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

Importantly, the negotiated Minimum Rental Rates in Schedule 7.2 were purposely lower than the market rents represented by Seller in the rent roll attached to the Purchase Agreement so that there would be no issue with Seller being able to comply with its obligation in Section 7.2 of the Purchase Agreement.

26.     After concluding negotiations of the Purchase Agreement, on or about January 6, 2020, the parties signed the Purchase Agreement and Seller provided Purchaser with a rent roll updated through that date.  Seller's production of the rent roll was in apparent compliance with Section 4.1(b) of the Purchase Agreement, which required Seller to provide Purchaser with a recent rent roll within three (3) business days after the Effective Date of the Purchase Agreement. Thereafter, Purchaser complied with all of its obligations under the Purchase Agreement and deposited $500,000 in Earnest Money with Fidelity National Title Company on January 8, 2020 (and an additional $500,000 in Earnest Money was deposited with Fidelity National Title Company on February 12, 2020 to bring the total Earnest Money deposit to $1,000,000).

27.     On January 27, 2020, the parties signed a First Amendment to Purchase Agreement (the "First Amendment"), a true and correct copy of which is attached as **Exhibit "B."**  In the First Amendment, Purchaser waived its right to terminate the Purchase Agreement for any reason other than the aforementioned limited tax issue.

28.     Despite Seller's prior production of the January 6 rent roll, Seller failed to comply with Section 7.2, which required Seller to provide Purchaser with an updated rent roll reflecting current lease activity at least twenty-four (24) hours before the expiration of the Due Diligence Period.  It should also be noted that Seller also failed to disclose the fact that it had entered into the Hubert Lease on January 22, 2020 (in violation of Section 7.2) until February 4, 2020 or that it was in possession of the other signed Offending Leases until on or about February 18, 2020 – in each case, *after* Seller had induced Purchaser to waive its right to terminate the Purchase Agreement "for any reason or for no reason whatsoever" pursuant to the First Amendment.

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

29.     Notably, had Seller delivered the rent roll as required under Section 7.2 revealing a significant change in the financial performance of the Apartments from December 2019 to January 2020, or had Seller's disclosed that it had entered into the Hubert Lease or of the existence of the other signed Offending Leases, Purchaser would not have entered into the First Amendment, but would have instead promptly terminated the Purchase Agreement.

30.     Although the First Amendment extended the "Due Diligence Period" to February 10, 2020, Purchaser could no longer terminate the Purchase Agreement "for any reason or for no reason whatsoever."  Instead, Purchaser's right to terminate the Purchase Agreement was limited to Seller's failure to satisfy certain tax obligations.  Because Seller's actions and omissions discussed in this lawsuit do not relate to the tax matters, only the initial Due Diligence Period (i.e. the period ending on January 27, 2020) is relevant to this lawsuit.

31.     By email dated February 4, 2020 (eight days following Purchaser's wavier of its right to terminate the Purchase Agreement "for any reason or for no reason whatsoever"), Seller disclosed the Hubert Leases to Purchaser for the first time.  The next day, Purchaser responded to Seller's disclosure of the Offending Leases by notifying Seller that it had violated Section 7.2 of the Purchase Agreement by entering into lease renewals with monthly rents below the Minimum Rental Rates in Schedule 7.2 without Purchaser's consent (and without disclosure to Purchaser). On February 18, 2020, the parties had a call to discuss operations at the Apartments and lease renewals.   On that call and over email correspondence occurring over the next three days, Purchaser learned to its dismay that Seller had not only unilaterally agreed to the Hubert Lease disclosed in the February 4 correspondence, but also that it had sent renewal offers to multiple tenants with rental rents below the Minimum Rental Rates in Schedule 7.2 in the months preceding the execution of the Purchase Agreement (i.e. Seller had no intention of performing its obligations under Section 7.2 of the Purchase Agreement) and that Seller had entered into the other Offending Leases.  Seller's fraud, dishonestly, misrepresentations and breach of the Purchase Agreement as

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

it related to the Minimum Rental Rates and the Offending Leases had reached an intolerable point for Seller at this juncture.

32.     Seller's intentional failure to disclose that it had offered renewals to the Apartments' tenants for less than the Minimum Rental Rates while at the same time negotiating those same Minimum Rental Rates was an act of fraud and deceit by Seller intended by Seller to induce Purchaser to enter into the Purchase Agreement and Seller's intentional failure to disclose the Hubert Lease and the other signed Offending Leases in violation of Section 7.6 of the Purchase Agreement, which required that Seller "keep Purchaser [Defendant] informed as to the ongoing operations at the Property and to all material developments . . . including, providing Purchaser [Defendant] with (i) prompt notice of all new Leases . . . or modifications to existing Leases . . .and (ii) copies of all material correspondence . . . delivered with respect to the Property . . . ." was an act of fraud and deceit by Seller intended by Seller to induce Purchaser to enter into the First Amendment.

33.     Seller's failure to disclose also breached its representation in Section 4.2 of the Purchase Agreement where Seller "represent[ed] that [it] has no actual knowledge that any … information is incomplete or misleading in any material respect." (emphasis added).

34.     In response to mounting evidence of Seller's fraud, deceit, misrepresentation, breach of the Purchase Agreement, and failure to disclose material information regarding the decline in net rental income and the existence of the Offending Leases, Purchaser sent Seller a Notice of Default on March 18, 2020 as required by Section 10.2 of the Purchase Agreement, and demanded the return of its Earnest Money, in addition to other relief afforded by the terms of the Purchase Agreement.

35.     Seller responded by letter on March 20, 2020 and rejected Purchaser's Notice of Default and refused return of Purchaser's $1,000,000 Earnest Money.

**B.     CAUSES OF ACTION**

**Count One—Breach of Contract: Seller Breached Section 7.2 of the Purchase Agreement**

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

36.     All preceding paragraphs are incorporated herein as if fully set forth.

37.     Seller breached Section 7.2 of the Purchase Agreement by entering into the Offending Leases with rental rates below the Minimum Rental Rates as required by Section 7.2 and Schedule 7.2. Section 7.2 of the Purchase Agreement was the subject to significant negotiation and was material consideration for Purchaser to enter into the Purchase Agreement. Seller knew (or should have known) that Purchaser would not have entered to the Purchase Agreement had Seller not agreed to the Minimum Rental Rates provided in Schedule 7.2.

38.     Seller also breached Section 7.2 of the Purchase Agreement by failing to provide Purchaser with an updated rent roll at least twenty-four (24) hours before the expiration of the Due Diligence Period. Seller knew (or should have known) that Purchaser would not have entered to the First Amendment had Seller provided the updated rent roll as required by Section 7.2 to Purchaser.

39.     Seller cannot cure these breaches/events of default because Purchaser learned about them after signing the Purchase Agreement, and after waiving its right to terminate the Purchase Agreement "for any reason or for no reason whatsoever", when Purchaser had already lost its ability to consider this information and exercise its right to terminate the Purchase Agreement "for any reason or for no reason whatsoever" and recover its Earnest Money as provided by Section 4.6 of the Purchase Agreement.

40.     As a direct result of Seller's breach, Purchaser is entitled to return of the Earnest Money Purchaser deposited with Fidelity National Title Company along with its actual, direct, indirect, nominal, incidental, reliance, consequential, economic, and non-economic damages incurred because of Seller's breach of the Purchase Agreement. Purchaser further seeks reimbursement of its reasonable and necessary attorneys' fees, interest, and cost of court as further alleged below and as allowed under the Purchase Agreement and by statute.

**Count Two—Breach of Contract: Seller Breached Section 4.2 of the Purchase Agreement**

41.     All preceding paragraphs are incorporated herein as if fully set forth.

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

42.     Seller breached Section 4.2 of the Purchase Agreement by failing to inform Purchaser that both the rent roll attached to the Purchase Agreement and the January 6, 2020 rent roll delivered pursuant to Section 4.1(b) were intentionally misleading.

43.     More specifically, the January 6, 2020 rent roll represented that the market rent for a lease with a tenant named Hubert was $1,260 per month despite the fact that Seller had already offered to renew the Hubert lease for $999 per month (i.e. $261 below the market rental rate represented by Seller and $100 below the applicable Minimum Rental Rate).  Seller did not disclose the renewal rate offered to Hubert nor the fact that Seller executed the Hubert lease renewal (on January 22, 2020) until February 4, 2020 – 13 days after Seller accepted the renewal Hubert lease, and 8 days after Seller fraudulently induced Purchaser to waive its right to terminate the Purchase Agreement "for any reason or no reason whatsoever" on January 27, 2020.

44.     Seller cannot cure this breach/event of default because Purchaser learned about Seller's actions after signing the Purchase Agreement, and after the expiration of the initial Due Diligence Period, when Purchaser had lost its ability to consider this information and exercise its right to terminate the Purchase Agreement "for any reason or for no reason whatsoever" and recover its Earnest Money as provided by Section 4.6 of the Purchase Agreement.

45.     As a direct result of Seller's breach, Purchaser is entitled to return of the Earnest Money Purchaser deposited with Fidelity National Title Company along with its actual, direct, indirect, nominal, incidental, reliance, consequential, economic, and non-economic damages incurred because of Seller's breach of the Purchase Agreement.

46.     Purchaser further seeks reimbursement of its reasonable and necessary attorneys' fees, interest, and cost of court as further alleged below and as allowed under the Purchase Agreement and by statute.

**Count Three—Breach of Contract: Seller Breached Section 7.6 of the Purchase Agreement**

47.     All preceding paragraphs are incorporated herein as if fully set forth.

48.     Seller breached Section 7.6 by failing to disclose that it had already offered renewals to several of the Apartments' tenants for less than the Minimum Rental Rates despite Seller's express obligation to do so.  Seller also breached Section 7.6 by failing to disclose that it had entered into the Offending Leases without the consent of Purchaser.

49.     Seller cannot cure this breach/event of default because Purchaser learned about Seller's actions after signing the Purchase Agreement, and after the initial Due Diligence Period expired, when Purchaser had already lost its ability to consider this information and exercise its right to terminate the Purchase Agreement "for any reason or for no reason whatsoever" and recover its Earnest Money as provided by Section 4.6 of the Purchase Agreement.

50.     As a direct result of Seller's breach, Purchaser is entitled to return of the Earnest Money Purchaser deposited with Fidelity National Title Company along with its actual, direct, indirect, nominal, incidental, reliance, consequential, economic, and non-economic damages incurred because of Seller's breach of the Purchase Agreement.

**Count Four—Failure of Conditions Precedent: Seller's Compliance with Articles 4.2, 7.2, and 7.6 were Conditions Precedent.**

51.     All preceding paragraphs are incorporated herein as if fully set forth.

52.     The truth of Seller's representation in Section 4.2, which provides, in relevant part, "Seller represents that Seller has no actual knowledge that any … information [disclosed to Purchaser] is incomplete or misleading in any material respect" was a condition precedent to the enforcement of Purchaser's obligations under the Purchase Agreement.

53.     Because Seller's representation at Section 4.2 was knowingly false; it was a failure of a condition precedent to Purchaser's obligations under the Purchase Agreement.

54.     Additionally, Seller's obligation to obtain Purchaser's prior written consent prior to entering into any new leases/lease renewals at rental rates below the Minimum Rental Rate as required by Section 7.2 was a condition precedent to the enforcement of Purchaser's obligations under the Purchase Agreement, and Seller's obligation to provide Purchaser with an updated rent

roll depicting lease activity during the Due Diligence Period at least twenty-four (24) hours before the expiration of the Due Diligence Period as required by Section 7.2, was a condition precedent to the enforcement of Purchaser's obligations under the Purchase Agreement.

55.     Because Seller did not obtain Purchaser's prior written consent prior to entering into the Offending Leases and Seller did not provide Purchaser with an updated rent roll depicting lease activity during the Due Diligence Period at least twenty-four (24) hours before the expiration of the Due Diligence Period; it was a failure of a condition precedent to Purchaser's obligations under the Purchase Agreement.

56.     Further, Seller's obligation under Section 7.6 to "keep Purchaser [Defendant] informed as to the ongoing operations at the Property and to all material developments . . . including, providing Purchaser [Defendant] with (i) prompt notice of all new Leases . . . or modifications to existing Leases . . . and (ii) copies of all material correspondence . . . delivered with respect to the Property . . . ." was a condition precedent to the enforcement of Purchaser's obligations under the Purchase Agreement.

57.     Seller failed to disclose that it had entered into the Offending Leases at rental rates below the Minimum Rental Rates as required by Schedule 7.2; therefore, it did not comply with its obligations under Section 7.6 and so another condition precedent to Purchaser's obligations under the Purchase Agreement failed to occur.

58.     Because of the failure of these conditions precedent, the provisions of the Purchase Agreement, which would otherwise obligate Purchaser to purchase the Apartments and/or cause the Earnest Money to be non-refundable, are not enforceable.

59.     Accordingly, Purchaser requests that the Court order the refund of the $1,000,000 in Earnest Money to Purchaser.

### Count Five—Fraudulent Inducement: Seller Fraudulently Induced Purchaser into Executing the Purchase Agreement and the First Amendment

60.     All preceding paragraphs are incorporated herein as if fully set forth.

61.     Seller knowingly or recklessly concealed material information concerning (i) the financial performance of the Apartments and (ii) its actions of providing renewal offers for the Offending Leases and then unilaterally executing the Offending Leases for below the Minimum Rental Rates in breach of the Purchase Agreement.

62.     Seller knew or should have known that Purchaser would value this information as material because Purchaser requested and negotiated the addition of a specific provision at Section 7.2 of the Purchase Agreement, which required that monthly rents exceed the Minimum Monthly Rents and that Seller not enter into any new leases or lease renewals with rental rates below such amounts.

63.     Seller intentionally or recklessly withheld this information until after Purchaser signed the Purchase Agreement and after Purchaser waived its right to terminate the Purchase Agreement "for any reason or for no reason whatsoever."

64.     As a result of Seller's deceitful omissions of material fact, Purchaser relied upon the information it had received from Seller (which was intentionally incomplete and misleading) and elected to enter into the Purchase Agreement and to not terminate the Purchase Agreement during the initial Due Diligence Period.

65.     Had Purchaser known about Seller's actions concerning the Offending Leases (including the existence of renewal offers at below Minimum Rental Rates at the time Seller was negotiating the Purchase Agreement), Purchaser would not have entered into to the Purchase Agreement and would have terminated the Purchase Agreement prior to the expiration of the initial Due Diligence Period and prior to the execution of the First Amendment.  It is noteworthy to mention that Seller had executed (and/or was in possession of) the Offending Leases on or about January 22, 2020 – while Seller was negotiating the First Amendment.  Seller's acts to secret such Offending Leases while negotiating (and executing) this important First Amendment is still further evidence of Seller's intentional fraudulent behavior.

66.     As a direct result of Seller's fraudulent inducement of Purchaser to enter into both the Purchase Agreement and the First Amendment, Purchaser is entitled to return of the Earnest Money Purchaser deposited with Fidelity National Title Company along with its actual, direct, indirect, nominal, incidental, reliance, consequential, economic, and non-economic damages incurred because of Seller's breach of the Purchase Agreement.

67.     Purchaser's injury resulted from Seller's actual fraud, deceit, misrepresentation, gross negligence, and malice, which entitles Purchaser to exemplary damages under Section 41.003(a) of the Texas Civil Practice & Remedies Code.

**Count Six—Statutory Fraud: Seller Violated Tex. Bus. & Com. Code § 27.01**

68.     All preceding paragraphs are incorporated herein as if fully set forth.

69.     Purchaser and Seller were parties to a transaction involving real estate.

70.     During the transaction, Seller made one or more false promises to Purchaser with the intent **not to fulfill** such promises, which promises were material to the transaction and to Purchaser's decision to enter into the Purchase Agreement.  In reliance on Sellers (false) promises, Purchaser entered into the Purchase Agreement to Purchaser's detriment.

71.     Specifically, Seller proposed the schedule of Minimum Rental Rates, which was attached to the Purchase Agreement as Schedule 7.2, which Seller represented was based on Seller's "currently offered rates" – despite the fact that Seller knew it had already offered to renew leases at the Apartment for rental rates below those same Minimum Rental Rates proposed by Seller, and in reliance on Seller's (false) promise, Purchaser agreed to enter into the Purchase Agreement to Purchaser's detriment.

72.     Additionally, in Section 4.6 of the Purchase Agreement, Seller represented that Seller had "no actual knowledge that any … information [disclosed to Purchaser] [was] incomplete or misleading in any material respect" – despite the fact that Seller knew that the market rents disclosed in the rent rolls provided to Purchaser (including, the rent roll attached to the Purchase Agreement) were materially overstated because Seller had already offered to renew certain leases

16

at rental rates below such market rents), and in reliance on Seller's (false) representation, Purchaser agreed to enter into the Purchase Agreement to Purchaser's detriment.

73.     Further, in Section 7.6, of the Purchase Agreement, Seller promised to "keep Purchaser [Defendant] informed as to the ongoing operations at the Property and to all material developments . . . including, providing Purchaser [Defendant] with (i) prompt notice of all new Leases . . . or modifications to existing Leases . . . and (ii) copies of all material correspondence . . . delivered with respect to the Property . . . ." – despite the fact that Seller had no intent on fulfilling such promise (as evidenced by Seller's failure to disclose the existing offers to renew leases at below the Minimum Rental Rates, and by Seller's failure to disclose that it had executed the Hubert Lease prior to Purchaser having waived its right to terminate the Purchase Agreement "for any reason or no reason whatsoever").   In reliance on Seller's (false) representations, Purchaser agreed to enter into the First Amendment to Purchaser's detriment.

74.     Purchaser justifiably relied on Seller's false representations and false promises by entering into the Purchase Agreement.   Specifically, based on these representations and agreements by Seller, Purchaser executed the Purchase Agreement, opened escrow with a $500,000 earnest money deposit, and began a costly and time-consuming due diligence process.

75.     Unbeknownst to Purchaser at the time of the execution of the Purchase Agreement was the fact that, notwithstanding the clear promises made by Seller in the Purchase Agreement regarding below market leases and timely disclosure of any new leases or modifications to leases, Seller had *already* provided tenants and prospective tenants with offers to renew their leases for rental rates below the negotiated Minimum Rental Rates.

76.     Seller's behavior reflects that during the negotiation and at the time of the execution of the Purchase Agreement, Seller had no intention to perform the promises contained therein in reference to the Minimum Rental Rates (or Seller's disclosure obligations) and made such false promises to fraudulently induce Purchaser to sign the Purchase Agreement in what Purchaser believes was an attempt to save itself from the impending foreclosure of its loan on the Apartments.

77.     Seller's false representations and false promises proximately caused injury to Purchaser.  Consequently, Purchaser is entitled to return of the Earnest Money Purchaser deposited with Fidelity National Title Company along with its actual, direct, indirect, nominal, incidental, reliance, consequential, economic, and non-economic damages incurred because of Seller's fraud.

78.     Exemplary damages.   Seller violated Section 27.01 of the Texas Business & Commerce Code, which is the basis of this suit, with actual awareness of the falsity of Seller's representations or promises, which entitles Purchaser to exemplary damages under Section 27.01(c).

### Count Seven—Negligent Misrepresentation

79.     All preceding paragraphs are incorporated herein as if fully set forth.

80.     Seller represented to Purchaser that the Minimum Rental Rates - the absolute floor rental rate for leases or lease renewals to be effected by Seller prior to the close of escrow - were the rates that Seller was "currently offer[ing]".

81.     Seller made the representation in the course of Seller's business and in a transaction in which Seller had a pecuniary interest.  Seller made the representation to induce Purchaser into entering into the Purchase Agreement to buy the Apartments.

82.     Seller's representation was a material (and intentional) misstatement of fact because Seller knew that it had already offered to enter into leases and lease renews with rental rates that were below the Minimum Rental Rates.  Further, Seller also failed to disclose information when Seller had a duty to so disclose.  Under Section 7.6 of the Purchase Agreement, Seller was required to disclose to Purchaser all material developments related to the Apartments, including any new leases and lease renewals.

83.     Seller did not use reasonable care in communicating the information to Purchaser.

84.     Purchaser actually and justifiably relied on Seller's representations when Purchaser represented that leases would exceed the Minimum Rental Rates and that Seller would keep Purchaser apprised of all material developments related to the Apartments.

85.     Seller's misrepresentations proximately caused injury to Purchaser.  Purchaser is entitled to return of the Earnest Money Purchaser deposited with Fidelity National Title Company along with its actual, direct, indirect, nominal, incidental, reliance, consequential, economic, and non-economic damages incurred because of Seller's breach of the Purchase Agreement.

86.     Exemplary damages.  Purchaser's injury resulted from Seller's gross negligence, which entitles Purchaser to exemplary damages under Section 41.003(a)(3) of the Texas Civil Practice & Remedies Code.

**C.     ATTORNEYS' FEES**

87.     All preceding paragraphs are incorporated herein as if fully set forth.

88.     Pursuant to Chapter 38 of the Texas Civil Practices & Remedies Code, Chapter 27 of the Texas Business and Commerce Code, and Section 10.2 of the Purchase Agreement, Purchaser seeks recovery of its reasonable and necessary attorneys' fees incurred in connection with the negotiation of the Purchase Agreement, as a result of its due diligence on the Property, obtaining financing, and representation in this lawsuit.

89.     Purchaser perfected its right to fees under the Texas law and the Purchase Agreement by providing Seller with a Notice of Default on March 18, 2020.  Seller rejected Purchaser's Notice of Default and demand for payment; therefore, Purchaser was required to retain the services of the undersigned counsel to prosecute this action.

## VI.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants-Purchasers pray that the Court dismiss all of Plaintiff's claims against them and that Purchasers be awarded judgment for the following relief against Seller:

a.     Monetary damages;

b.     Punitive/Exemplary Damages

c.     Prejudgment interest;

d.     All costs of court;

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

e.      All attorneys' fees incurred by Purchasers;

f.      Post-judgment interest; and

g.      Such other and further relief, special or general, legal or equitable, as
        Purchasers may show themselves to be justly entitled to receive.

                                    Respectfully submitted,

                                    JACKSON WALKER LLP
                                    112 East Pecan Street, Suite 2400
                                    San Antonio, Texas  78205
                                    (210) 978-7700
                                    (210) 978-7790 – Fax
                                    mswantner@jw.com
                                    zzurek@jw.com

                                    By:   /s/ Matthew J. Swantner
                                    Matthew J. Swantner
                                    State Bar No. 24066169
                                    Zach Zurek
                                    State Bar No. 24079668

                                    **ATTORNEYS FOR DEFENDANTS-
                                    PURCHASERS**


                        CERTIFICATE OF SERVICE

        I hereby certify that on April 24, 2020, I electronically filed the foregoing document with

the Clerk of the Court using CM/ECF system which will send notification of such filing to the

following counsel of record:

Matthew R. Stamel                   mstammel@velaw.com
Emalee H. LaFuze                    elafuze@velaw.com
Vinson & Elkins LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201-2975


                                     /s/ Matthew J. Swantner
                                    Matthew J. Swantner

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

## **JURAT**

My name is Christopher R. Dornin, my date of birth is May 7, 1977, and my work address is 6725 Via Austi Parkway, Suite 380, Las Vegas, Nevada 89119.  I declare under penalty of perjury that the foregoing Defendants-Purchasers' Original Answer and Counterclaim and that every statement contained in paragraphs 11 and 51 through 59 of the Original Answer and Counterclaim is within my personal knowledge and is true and correct.

Executed in Blaine County, State of Idaho, on the ___24___ day of April 2020.

_____
Declarant

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM
25512837v.11

**EXHIBIT A**

**PURCHASE AND SALE AGREEMENT**

**PURCHASE AND SALE AGREEMENT**

**BETWEEN**

**WG MONTERREY VENTURE LLC**
**AS "SELLER"**

**AND**

**DORNIN INVESTMENT GROUP, LLC**
**AS "PURCHASER"**

**DATED AS OF JANUARY 6, 2020**

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is made as of January 6, 2020 (the "**Effective Date**"), by and between **WG MONTERREY VENTURE LLC,** a Delaware limited liability company ("**Seller**"), and **DORNIN INVESTMENT GROUP, LLC,** a Delaware limited liability company ("**Purchaser**").

**IN CONSIDERATION** of the Earnest Money (as defined in this Agreement), the mutual covenants of the parties, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and Seller agree follows:

## ARTICLE 1
## PURCHASE AND SALE

1.1 *Agreement of Purchase and Sale.* Subject to the terms and conditions hereinafter set forth, Seller agrees to sell and convey, and Purchaser agrees to purchase, the following:

(a) that certain tract or parcel of land situated in San Antonio, Texas, more particularly described on *Exhibit A*, together with all and singular the rights and appurtenances pertaining to such property, including any right, title and interest of Seller in and to adjacent streets, alleys, or rights-of-way (the "**Land**");

(b) the buildings, structures, fixtures and other improvements located on the Land (the "**Improvements**");

(c) all of Seller's right, title and interest in and to all tangible personal property upon the Land or within the Improvements, including specifically, without limitation, appliances, furniture, carpeting, draperies and curtains, tools and supplies, and other items of personal property owned by Seller and used exclusively in connection with the operation of the Land and the Improvements (the "**Personal Property**");

(d) all of Seller's right, title and interest in and to all agreements pursuant to which any portion of the Land or Improvements is used or occupied by anyone other than Seller (the "**Leases**"); and

(e) pursuant to Section 1.4 hereof, all of Seller's right, title and interest in and to (i) all assignable service contracts, equipment and furniture leases and agreements listed and described on *Exhibit B* (the "**Service Contracts Schedule**"), relating to the upkeep, repair, maintenance or operation of the Land, Improvements or Personal Property (collectively, the "**Service Contracts**"); (ii) all assignable trade names, logos, licenses, permits, air rights, certificates of occupancy, signs, trademarks, telephone listings and numbers, but expressly excluding the "**Echelon**" trademark, trade name and logo, web domain, and internet address, and any other trademark, trade name, logo, website, web domain or internet address that includes the term "**Echelon**"; (iii) all freely assignable warranties/guarantees relating to the Improvements or the Personal Property other than any warranty or guarantee from The Garrett Construction Company, LLC ("**Garrett Construction**"); and (iv) all rights to any plans, specifications,

engineering studies, reports, drawings, and prints relating to the construction of the Improvements (collectively, the "**Intangibles**").

      **1.2**    ***Property Defined.***  The Land, the Improvements, the Personal Property, the Leases, the Service Contracts and the Intangibles are sometimes referred to collectively as the "**Property**."

      **1.3**    ***Permitted Exceptions.***  The Property will be conveyed subject to the matters which are, or are deemed to be, Permitted Exceptions pursuant to Article 3 hereof (the "**Permitted Exceptions**").

      **1.4**    ***Service/Lease Contracts.***  Seller or its property manager shall have the right to enter into new Service Contracts after the Effective Date in its normal course of business or in the normal course of business of a prudent multifamily property manager. Purchaser will notify Seller at least thirty (30) days prior to Closing which, if any, Service Contracts Purchaser will not assume at Closing (the "**Rejected Service Contracts**"); provided, however, Purchaser shall be obligated to assume the contract for provision of cable, internet, phone and/or telecommunications services to the Property a copy of which is attached as ***Exhibit K***. Seller shall cause the Rejected Service Contracts to be terminated as of Closing and Seller shall be responsible for the payment of any termination fees associated therewith.

      **1.5**    ***No Warranty.***  Subject to the representations and warranties of Seller set forth in this Agreement, Seller is selling, and Purchaser is purchasing, the Property "**AS IS, WHERE IS**", and with all faults; provided, that, in no event shall this Section 1.5 be interpreted as waiving or otherwise limiting any of Purchaser's rights under applicable warranties/guarantees relating to the construction of the Improvements and/or applicable Texas construction defect laws. The survival of the provisions of this Section 1.5 are a material inducement to Seller entering into this Agreement and accordingly shall survive the Closing or earlier termination of this Agreement and shall be deemed incorporated into the Closing Documents to be delivered at Closing.

**ARTICLE 2**
**PURCHASE PRICE & EARNEST MONEY**

      **2.1**    ***Purchase Price.***  The purchase price for the Property is Thirty Eight Million Five Hundred and 00/100 Dollars ($38,500,000.00) (the "**Purchase Price**").

      **2.2**    ***Payment of Purchase Price.***  The Purchase Price is payable in full at Closing, without reduction, adjustment or setoff (other than as expressly authorized with respect to the closing adjustments and prorations set forth in Article 9), in cash by federal wire transfer of immediately available funds to a bank account designated by Seller in writing to Title Insurer at or prior to Closing.

      **2.3**    ***Earnest Money.***  Earnest money payments shall be made as follows:

          (a)    On or before January 8, 2020 (i.e. two (2) days following the Effective Date of this Agreement), Purchaser shall deposit with Fidelity National Title (the "**Title Insurer**") an initial deposit of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (together with interest earned thereon, the "**Initial Deposit**"). Purchaser shall deposit an additional Five Hundred

-2-

Thousand and 00/100 Dollars ($500,000.00) (together with interest earned thereon, the "**Additional Deposit**") within two (2) business days following the Due Diligence Period if Purchaser has not terminated this Agreement pursuant to the terms hereof prior to the expiration of the Due Diligence Period (the "**Additional Deposit**").  Failure of Purchaser to deposit the Additional Deposit as provided herein shall be deemed confirmation of Purchaser's election to terminate this Agreement pursuant to Section 4.6.  The Initial Deposit, the Additional Deposit and all other deposits required herein, together with all interest earned on such sums are referred to herein as the "**Earnest Money**".  All Earnest Money will apply toward the Purchase Price.

> **2.4    *Independent Consideration***.  Notwithstanding anything in this Agreement to the contrary, One Hundred Dollars ($100.00) of the Initial Deposit (the "**Independent Consideration**") shall be paid by Title Insurer to Seller and considered completely nonrefundable to Purchaser in all events, it being the intent of the parties to recognize that such amount has been bargained for and agreed to as independent consideration for Purchaser's exclusive right to purchase the Property pursuant to and in accordance with this Agreement, and for Seller's execution and delivery of this Agreement.  The Independent Consideration shall be applied towards the Purchase Price at Closing only if Closing occurs but shall otherwise be nonrefundable as aforesaid.

**ARTICLE 3**
**TITLE AND SURVEY**

> **3.1    *Seller's Title and Survey Deliveries.***  Seller shall deliver to Purchaser within five (5) business days hereof:

> > (a)    a copy of Seller's existing policy of title insurance; and

> > (b)    a copy of Seller's most recent survey of the Property.

> **3.2    *Title Examination and Survey.***  Purchaser shall obtain a title commitment for the Property from the Title Insurer and a survey from a surveyor of its choice.  Purchaser shall complete its examination of title to the Property, including, without limitation, matters of survey, prior to the expiration of the Due Diligence Period (as hereinafter defined).  Without limiting the foregoing, if there is any matter of title or survey adversely affecting title to the Property (each, a "**Title Defect**"), then Purchaser may give written notice of such Title Defect to Seller at any time prior to the end of the Due Diligence Period (such notice, the "**Objection Notice**").  Upon receipt of the Objection Notice, Seller may, at Seller's option, give written notice to Purchaser (the "**Response Notice**") no later than five (5) business days after receipt of the Objection Notice (the "**Response Period**") indicating Seller's willingness to cure any Title Defects prior to Closing.  If Seller fails to deliver the Response Notice prior to the expiration of the Response Period, Seller shall be deemed to have elected not to cure any of the matters contained in Purchaser's Objection Notice.  If Seller elects (or is deemed to have elected) not to cure one or more Title Defects, Purchaser shall have the right on or before the later of (i) five (5) business days after the expiration of the Response Period, or (ii) the expiration of the Due Diligence Period to terminate this Agreement; provided that, in the event Purchaser shall fail to respond to Seller's Response Letter prior to the expiration of the applicable response period, Purchaser shall be deemed to have elected to terminate this Agreement.  If Purchaser elects, or is deemed to have elected, to terminate this

-3-

Agreement, all Earnest Money shall be refunded to Purchaser, this Agreement shall terminate and be of no further force or effect, and neither party shall have any further rights or obligations under this Agreement, other than those which expressly survive a termination hereof. If Purchaser does not so terminate this Agreement then all title matters then existing shall be deemed "**Permitted Exceptions**," except for Title Defects that Seller has agreed to cure prior to Closing. Purchaser acknowledges and agrees that Seller shall have no obligation or duty whatsoever to cure any title exceptions or defects affecting the Property. Notwithstanding anything contained herein to the contrary, the Property shall be conveyed subject to the following matters, which shall be deemed included in the Permitted Exceptions: (i) the rights of tenants, as tenants only, under the Leases and any new Leases entered into between the date hereof and Closing in accordance with the terms of this Contract; (ii) the lien of all ad valorem real estate and personal property taxes and assessments not yet due and payable as of the date of Closing, subject to adjustment as herein provided; (iii) local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect relating to the Property; and (iv) matters created by, through or under Purchaser. Notwithstanding anything to the contrary, Seller shall cause to be removed from title at or before Closing any and all liens secured by deeds of trust encumbering the Property, mechanic's liens relating to the Property, judgment liens against Seller, and delinquent real estate taxes.

      **3.3**    *Subsequent Title Defects.* In the event any matter affecting title to the Property arises or is first disclosed to Purchaser after the expiration of the Due Diligence Period within five (5) business days of discovery, Purchaser must elect one of the following: (i) to terminate this Agreement, in which case the Earnest Money will be refunded in full to Purchaser and thereupon this Agreement shall terminate and be of no further force or effect whatsoever, except for the terms of this Agreement which expressly survive a termination hereof, and Purchaser shall cooperate with Seller to provide an instrument in recordable form that disclaims any and all continuing right, title or interest of Purchaser in and to the Property (as necessary); (ii) to waive such title defect and proceed with Closing pursuant to the terms and conditions hereof without offset or other credit or adjustment to the Purchase Price; or (iii) to give written notice of such title defect to Seller, and upon receipt of such notice, Seller may, at Seller's option, give written notice to Purchaser within five (5) business days after receipt of Purchaser's notice indicating Seller's willingness to cure such title defect(s) prior to Closing. The failure by Seller to timely deliver such notice shall be deemed Seller's election not to cure any such matter. If Seller does not elect (or is deemed to have not elected) to cure such title defect(s), then Purchaser shall have the right within five (5) business days to terminate this Agreement, in which event all Earnest Money shall be refunded to Purchaser, this Agreement shall be deemed to be terminated and of no further force or effect, and neither party shall have any further rights or obligations under this Agreement, other than those which expressly survive a termination hereof. A failure to make an affirmation election pursuant to the preceding clauses shall be deemed an election or option (iii) above.

      **3.4**    **Notice**. Purchaser will provide to Seller's representative, Rob Martinson, VP of Investments, two (2) business days' prior notice of when survey crews will be on the Property.

## ARTICLE 4
## INFORMATION AND DUE DILIGENCE

**4.1**   *Seller's Deliveries.*   Seller shall, within three (3) business days after the Effective Date of this Agreement, make available to Purchaser in electronic format certain documentation pertaining to the Property (the "**Information Documents**") to the extent available and in the possession or control of Seller or Seller's property manager.   The Information Documents include, without limitation, the following:

(a)      Seller's most recent ALTA survey; and any existing owner's policy of title insurance; and

(b)      a recent rent roll ("**Rent Roll**"); and

(c)      all third party due diligence reports obtained by Seller in its development of the property, including geotechnical & environmental reports; and

(d)      all Service Contracts that are in place; and

(e)      copies of all Unit Statistic Reports from operating software, and Meter Health Report from Utility Billing Company; and

(f)      documentation of the Property's zoning status; and

(g)      copies of all Leases in place at the Property; and

(h)      schedule of capital improvements for past two (2) years; and

(i)      copies of any existing PCAs or Phase 1 reports; and

(j)      any existing leasing brochures, leasing plans for each unit type, and copies of form lease; and

(k)      payroll schedule for onsite employees (including, employees of property manager), including, any housing allowance; and

(l)      copy of RUBS and any 3rd party billing agencies; and

(m)      insurance loss runs for the last twenty-four (24) months; and

(n)      two (2) years of tax bills; and

(o)      copies of the following construction related documents relating to the Land and Improvements: as-built plans and drawings; plans and specifications.

Furthermore, within three (3) business days after receipt of a written request from Purchaser, Seller will make available to Purchaser any other contracts, documents or building plans of significance to the Property and such other information relating to the Property that is specifically requested by

Purchaser to the extent such information either is in the possession or control of Seller, or any manager retained by Seller to manage the Property, or any affiliate of Seller; provided, that, in no event shall Seller have any obligation to deliver any confidential, proprietary or attorney - client privileged information.

      **4.2**    ***Reliability of Information***.   The Information Documents and any additional information requested by Purchaser are being furnished to Purchaser for information purposes only. Purchaser acknowledges and agrees that it is accepting the Information Documents and other documents with the understanding that certain information therein has been compiled by persons and entities other than Seller, and Seller has not verified and does not independently certify that such information contained therein is true, correct or complete in all respects. With respect to any third-party reports, Purchaser further acknowledges and agrees that it understands and has been informed by Seller that Seller has not and does not adopt or ratify the findings of the third-Party consultants who prepared the third-party reports, does not represent that the third-party reports are accurate in all respects, and does not warrant or represent that the third-party reports can or should be relied upon by Purchaser in making its investment decisions concerning the Property. Notwithstanding the foregoing, Seller represents that Seller has no actual knowledge that any such information is incomplete or misleading in any material respect.

      **4.3**    ***Due Diligence Period Defined***.   As used in this Agreement, the term "**Due Diligence Period**" means the period commencing upon the Effective Date and ending at 6:00 p.m. Pacific Time on January 27, 2020 (i.e. the date that is twenty one (21) days after the Effective Date).

      **4.4**    ***Purchaser's Due Diligence.***   During the Due Diligence Period (as hereinafter defined) and subject to this Agreement, Purchaser may inspect the Property and otherwise use due diligence to determine the suitability of the Property as an investment by Purchaser, at its sole cost and expense. In addition to such other activities that Purchaser may determine to be appropriate to carry out such due diligence, Purchaser may do any or all of the following activities: (a) examine the Information Documents; (b) interview Seller and Seller's property manager with respect to the construction of the Improvements; (c) examine the physical structures and components of the Improvements; (d) conduct studies to determine that the Property and the operation thereof complies with all requirements of all governmental agencies and authorities having jurisdiction with respect thereto, (e) make such studies and investigations, conduct such tests and surveys and engage such independent contractors, environmental engineers, environmental consultants, and experts as necessary to enable Purchaser to evaluate any and all environmental risks associated with the ownership and operation of the Property and its compliance with "**Environmental Laws**" (as defined in Section 4.8); and (f) otherwise conduct a complete and thorough investigation and examination of the Property. To the extent Purchaser does not currently have available its own employees who are competent to conduct such examinations and due diligence, Purchaser may retain such consultants, independent contractors and other professional advisors as Purchaser deems necessary. In performing its due diligence and examinations, Purchaser will provide Seller with appropriate advance notice regarding the scope and execution of its activities, including, proposed timing of inspections and any anticipated need to interview specified personnel. Purchaser will not unreasonably disturb or interfere with the operation, management or use of the Property by Seller, its contractors, suppliers and vendors, the

tenants under the Leases, or by any of their respective agents, customers, invitees, or guests.  In no event will Purchaser or any of its agents or contractors be entitled to conduct inspection activities that involve the drilling or boring into the Land or Improvements, or any other similar invasive or destructive activity without the written consent of Seller.  Purchaser will give Seller two (2) business days' notice of the arrival of any inspection personnel to the property.

4.5     *Indemnity and Liability Insurance.*  Purchaser will be responsible for any and all losses, damages, charges and other costs associated with its examinations, inspections, and other activities conducted as a part of its due diligence, and at the conclusion of the Due Diligence Period, will return the Property to the same condition as existed prior to such examinations, due diligence and other activities.  Purchaser will immediately discharge any liens that attach against the Property as a result of its conducting of due diligence investigation by payment, bonding off or otherwise removing such liens promptly on demand.  Purchaser agrees to indemnify and hold harmless Seller from and against any and all claims, charges, actions, costs (including reasonable attorneys' fees), suits, damages, injuries, or other liabilities which arise, either directly or indirectly, from Purchaser's or its agent's, contractor's, representative's, or employee's entry onto the Land and Improvements prior to Closing; provided, however, that the foregoing shall not apply to any such items caused by Seller or Seller's property manager's gross negligence or willful misconduct, nor shall the foregoing apply to the mere discovery of any pre-existing condition at the Property or any portion thereof.  Prior to Purchaser or its employees, agents, inspectors or vendors accessing the Property, Purchaser shall provide Seller with a certificate of insurance naming Seller as an additional insured and evidencing liability coverage in form and substance acceptable to Seller in an amount not less than $1,000,000.00 per occurrence with an aggregate limit of not less than $2,000,000.00.

4.6     *Purchaser's Right to Terminate.*  At any time prior to the expiration of the Due Diligence Period, Purchaser will have the right to elect to terminate this Agreement for any reason or for no reason whatsoever.  Any such election shall be in writing, and upon receipt thereof by Seller, the Earnest Money will be refunded in full to Purchaser and thereupon this Agreement shall terminate and be of no further force and effect whatsoever, except for the terms of this Agreement which expressly survive termination by Purchaser.  Notwithstanding anything to the contrary, unless Purchaser shall affirmatively elect to proceed with Closing at or before the expiration of the Due Diligence Period by written notice to Seller and Title Insurer, Purchaser shall be deemed to have timely elected to have terminated this Agreement.

4.7     *Continuing Agreement.*  If Purchaser does not elect (or is not deemed to have elected) to terminate this Agreement prior to the expiration of the Due Diligence Period, then: (a) this Agreement will remain in full force and effect, and (b) **PURCHASER WILL BE DEEMED TO HAVE ACCEPTED THE PROPERTY ON AN "AS IS" BASIS, SUBJECT ONLY TO THE TERMS OF THIS AGREEMENT AND THE TERMS AND CONDITIONS SET FORTH IN THE DOCUMENTS AND AGREEMENTS EXECUTED AND DELIVERED AT CLOSING,** and (c) Purchaser will be deemed to have agreed to accept title to the Property subject to the Permitted Exceptions.  **PURCHASER HAS AGREED TO ACCEPT POSSESSION OF THE PROPERTY AT CLOSING ON AN "AS IS" BASIS.  SELLER AND PURCHASER AGREE THAT THE PROPERTY WILL BE SOLD "AS IS" AND EXCEPT AS SET FORTH IN ARTICLE 5, SUCH SALE WILL BE WITHOUT**

**REPRESENTATION OR WARRANTY BY SELLER OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, WARRANTY OF INCOME POTENTIAL, OPERATING EXPENSES, USES, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE), AND SELLER HEREBY DISCLAIMS AND RENOUNCES ANY SUCH REPRESENTATION OR WARRANTY.**

Except as expressly set forth in this Agreement to the contrary, Purchaser releases Seller, its managers, and its respective direct or indirect members, partners, shareholders, officers, directors, employees or agents (collectively, the "**Seller Related Parties**") and their respective successors and assigns from and against any and all claims that Purchaser or any party related to or affiliated with Purchaser (each, a "**Purchaser Related Party**") has or may have arising from or related to any matter or thing related to or in connection with the Property except as expressly set forth in this Agreement to the contrary, including the documents and information referred to herein, the Leases, the Tenants (as defined below), and any environmental conditions and, except as expressly set forth in this Agreement to the contrary, neither Purchaser nor any Purchaser Related Party shall look to Seller, the Seller Related Parties or their respective successors and assigns in connection with the foregoing for any redress or relief.  This release shall be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected claims, damages, and causes of action.  To the extent required to be operative, the disclaimers and warranties contained herein are "**conspicuous**" disclaimers for purposes of any applicable law, rule, regulation, or order.

**NOTWITHSTANDING THE FOREGOING, NEITHER THIS SECTION 4.7, NOR ANY OTHER TERM OR CONDITION CONTAINED IN THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT GIVEN IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY, SHALL IN ANY WAY WAIVE OR OTHERWISE LIMIT ANY OF PURCHASER'S RIGHTS UNDER APPLICABLE WARRANTIES/GUARANTEES RELATING TO THE CONSTRUCTION OF THE IMPROVEMENTS AND/OR APPLICABLE TEXAS CONSTRUCTION DEFECT LAWS.**

**4.8** *"AS IS" Defined.*  As used in this Agreement, the term "**AS IS**" means, as and where the Property presently exists as of the expiration of the Due Diligence Period, including, without limitation, all faults, defects, claims, liens, and other conditions of every kind or description with respect to (a) physical and environmental condition of the Property, including defects seen and unseen and conditions natural and artificial, (b) the Permitted Exceptions, (c) the Service Contracts, (d) the financial operation and condition of the Property, (e) compliance with all laws, ordinances, rules and regulations to which the Property is subject, (f) all claims, demands, actions or causes of action that relate in any way to the Property or the ownership and operation thereof, whether known or unknown, and (g) all other matters related in any way to the ownership and operation of the Property, whether known or unknown.  **Notwithstanding the foregoing, neither this Section 4.8, nor any other term or condition contained in this Agreement or any other document or instrument given in connection with this Agreement or the transaction contemplated hereby, shall in any way waive or otherwise limit any of Purchaser's rights under applicable warranties/guarantees relating to the construction of the Improvements and/or applicable Texas construction defect laws.**

Except as otherwise provided in this Agreement, Seller makes no warranty with respect to the presence of Hazardous Materials on, above, or beneath the Property (or any parcel in proximity thereto) or in any water on or under the Property.  The Closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws.  As used herein, the term "**Hazardous Materials**" shall mean: (a) those substances included within the definitions of any one or more of the terms "**hazardous materials**", "**hazardous wastes**", "**hazardous substances**", "**industrial wastes**", and "**toxic pollutants**", as such terms are defined under the Environmental Laws, or any of them; (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof; (c) natural gas, synthetic gas and any mixtures thereof; (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable; (e) polychlorinated biphenyl ("**PCBs**") or PCB-containing materials or fluids; (f) radon; (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, (h) radioactive materials or substances, and (i) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation.  As used herein, the term "**Environmental Laws**" shall mean all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 5101 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 et seq.), the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), any state or local counterpart or equivalent of any of the foregoing, and any federal, state or local transfer of ownership notification or approval statutes.

The provisions of Sections 4.5, 4.7 and 4.8 shall survive the Closing or the earlier termination of this Agreement and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

**4.9**   *Availability of Information.*   Notwithstanding the fact that the Information Documents and other information concerning the Property may be located in more than one location, all such files and documents will be made available for Purchaser's due diligence, review and copying at the Property.

**4.10**   *Information from Agents.*   In making its investment decisions with respect to the Property, including its decision to elect or not elect to terminate this Agreement during the Due Diligence Period, subject to the terms of Section 14.1 of this Agreement, Purchaser may interview tenants, Seller's property manager, the other parties to the Service Contracts, and Seller's

-9-

employees, agents, contractors, and investment advisors.  Seller shall cooperate with Purchaser in connection with its due diligence activities and will instruct its property manager and Seller's employees (if any), agents, contractors, and investment advisors to cooperate with Purchaser and its agents, contractors and consultants.  Notwithstanding the foregoing, Seller shall not have any liability with respect to any opinions, statements, warranties, representations, or other information furnished to Purchaser by such employees, agents, contractors, and investment advisors, unless expressly incorporated in this Agreement as Seller's representations.

## ARTICLE 5
## SELLER'S WARRANTIES & REPRESENTATIONS

Seller represents and warrants to the Purchaser the following:

5.1     Seller has been duly organized and is validly existing under the laws of the State of Delaware.  Seller is duly qualified to do business and is in good standing in the State where the Property is located.  Seller has the full right and authority to enter into this Agreement and to transfer all of the Property to be conveyed by Seller and to consummate or cause to be consummated the transactions contemplated herein in accordance with the terms hereof.  No consents, approvals or other authorizations are required by other partners, entities, trusts or other organization or individuals in order to validly effectuate the transactions contemplated hereby.  The person signing this Agreement on behalf of Seller is authorized to do so and may bind the Seller without the joinder or co-signature of any other person.

5.2     There is no action, suit, arbitration, unsatisfied order or judgment, governmental investigation or proceeding threatened or to Seller's knowledge pending against Seller, the Property, or the transaction contemplated by this Agreement.

5.3     Seller has received no written notification that any governmental agency has determined that there are any violations of any Environmental Laws with respect to the Property.

5.4     To Seller's knowledge, the Service Contracts Schedule is a true, correct and complete list of the Service Contracts in effect with respect to the Property as of the Effective Date of this Agreement.

5.5     The Seller is the sole owner of, and shall convey at Closing fee simple title to, the Property, subject only to the Permitted Exceptions.

5.6     The Seller owns legal and beneficial title to the Personal Property, other than any leased equipment at the Property, and at Closing shall convey the same free and clear of all liens, charges and encumbrances, subject only to the Permitted Exceptions.

5.7     Seller has not granted to any person or entity any option or other right to purchase all or any portion of the Property and no person or entity has any option or other right to purchase the Property.

1190996/LA

**5.8**    The execution and delivery of this Agreement, and its performance by Seller, will not conflict with, or result in the breach of, any contract, agreement, law, rule or regulation to which Seller is a party, or by which Seller or any Property owned by Seller is bound.

**5.9**    This Agreement has been duly authorized, executed and delivered and is valid and enforceable against Seller in accordance with its terms, and each instrument to be executed by Seller pursuant to this Agreement, or in connection herewith, will, when executed and delivered, be valid and enforceable against Seller in accordance with its terms, except as such enforcement may be limited by bankruptcy and other laws affecting creditors' rights generally and principles of equity.

**5.10**    Seller has not made and does not intend to make a general assignment for the benefit of its creditors; nor has Seller had an attachment, execution or other judicial seizure of any property interest which remains in effect.

**5.11**    There is not pending any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or recomposition of Seller, or the debts of Seller, under any law relating to bankruptcy, insolvency, reorganization or the relief of debtors, or seeking the appointment of a receiver, trustee, custodian or other similar official for Seller or the Property.

**5.12**    To Seller's knowledge, the Property is not contaminated with any Hazardous Substances.

**5.13**    To the best of Seller's knowledge, the Rent Roll is the rent roll utilized by Seller in operating the Property in the ordinary course of business; and there are no leases, licenses or other similar occupancy agreements with respect to the leasing or occupancy of the Property other than those shown on the Rent Roll delivered to Purchaser.

**5.14**    To the best of Seller's knowledge, Seller has delivered to Purchaser true and correct copies of the Leases (including all amendments, supplements, and modifications thereto).  No Person has a right to use or occupy the Property other than pursuant to the Leases.  Neither Seller's interest in the Leases nor any of the rentals due or to become due under the Leases has been assigned or will be assigned, encumbered or subject to any liens at the Closing Date.

**5.15**    Seller has not received any written notice from any governmental agency that the Property or any condition existing thereon or any present use thereof currently violates any law or regulations applicable to the Property.

**5.16**    Seller has received no written notice of any unpaid charges, debts, liabilities, claims or obligations arising from the construction, occupancy, ownership, use or operation of the Property prior to Closing which could give rise to any mechanic's or materialmen's or other statutory liens against any of the Property which will not be paid by or bonded over by Seller at Closing, or for which Purchaser will be responsible.

**5.17**    Other than any possible property tax appeal or property tax litigation, there is no litigation, arbitration or other legal or administrative suit, action, proceeding or investigation of any kind pending or, to Seller's knowledge threatened against or involving Seller relating to the

Property or any part thereof, including, but not limited to, any condemnation action relating to the Property or any part thereof.

5.18    Neither Seller, nor any constituent owner of Seller, nor, to Seller's knowledge, any person or entity (in each case, other than shareholders of any publicly traded company) with actual authority to direct the actions of any member, partner or shareholder of Seller, (i) are named on any list of persons, entities and governments issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**") pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism ("**Executive Order 13224**"), as in effect on the date hereof, or any similar list known to Seller or publicly issued by OFAC or any other department or agency of the United States of America (collectively, the "**OFAC Lists**"), (ii) are included in, owned by, controlled by, knowingly acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with any of the persons, entities or governments referred to or described in the OFAC Lists, or (iii) has knowingly conducted business with or knowingly engaged in any transaction with any person, entity or government named on any of the OFAC Lists or any person, entity or government included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or, to Seller's knowledge, otherwise associated with any of the persons, entities or governments referred to or described in the OFAC Lists.

5.19    Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the Income Tax Regulations thereunder.

5.20    Garrett Construction acted as the general contractor but performed no actual work of construction on the Land or in connection with the Improvements, and the assignable warranties and guarantees described in Section 1.1(e)(iii) are the only warranties and guarantees relating to such work of construction except as may have been given by Garrett Construction.

As used in this Agreement, the phrase "**to Seller's knowledge**" and words of similar import shall mean the actual, current knowledge (as of the date the representation and warranty is made) of Eric Garrett regarding the Property without duty of investigation or inquiry, and no knowledge shall be imputed to any other person or entity.  The representations and warranties of Seller set forth in this Article 5, as updated by the certificate of Seller to be delivered to Purchaser at Closing in accordance with Article 9 hereof, shall survive Closing for a period of twelve (12) months.  No claim for a breach of any representation or warranty of Seller shall be actionable or payable (a) if the breach in question results from or is based on a condition, state of facts or other matter which was known to Purchaser prior to Closing, (b) unless the valid claims for all such breaches collectively exceed $25,000.00, in which event the full amount of such valid claims shall be actionable, up to but not exceeding the amount of the Liability Cap (as defined below), and (c) unless written notice containing a description of the specific nature of such breach shall have been given by Purchaser to Seller prior to the expiration of said twelve (12) months.  As used herein, the term "**Liability Cap**" shall mean the total aggregate amount of $750,000.00.  Except in connection with Seller's actual fraud, in no event shall Seller's aggregate liability to Purchaser for breach of any representation or warranty of Seller in this Agreement exceed the amount of the Liability Cap.

## ARTICLE 6
## PURCHASER'S WARRANTIES & REPRESENTATIONS

**6.1**     *Purchaser's Authority, Etc.*  Purchaser is a limited liability company, duly formed, validly existing, and in good standing under the laws of the State of Delaware.  Purchaser has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite action necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been, or by the Closing will have been, taken.  The person signing this Agreement on behalf of Purchaser is authorized to do so and may bind Purchaser without the joinder or co-signature of any other person.

**6.2**     *No Litigation.*  There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser which, if adversely determined, could individually or in the aggregate interfere with the consummation of the transaction contemplated by this Agreement.

**6.3**     *Survival of Purchaser's Representations and Warranties.*  The representations and warranties of Purchaser set forth this Agreement shall survive Closing for a period of six (6) months.  No claim for a breach of any representation or warranty of Purchaser shall be actionable or payable (a) if the breach in question results from or is based on a condition, state of facts or other matter which was known to Seller prior to Closing, (b) unless the valid claims for all such breaches collectively aggregate more than $25,000.00, in which event the full amount of such valid claims shall be actionable, up to but not exceeding the amount of the Liability Cap (as defined below), and (c) unless written notice containing a description of the specific nature of such breach shall have been given by Seller to Purchaser prior to the expiration of said six (6) months.  As used herein, the term "**Liability Cap**" shall mean the total aggregate amount of $200,000.00.  In no event shall Purchaser's aggregate liability to Seller for breach of any representation or warranty of Purchaser in this Agreement exceed the amount of the Liability Cap.

## ARTICLE 7
## COVENANTS AND EXECUTORY AGREEMENTS PENDING CLOSING

**7.1**     *Contracts*.  From and after the Effective Date and continuing through the day immediately preceding the expiration of the Due Diligence Period, Seller shall not enter into any new contracts or any amendments or modifications to the existing contracts that will survive Closing without Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed (and provided that no such consent shall be necessary in the event such contract is required in connection with an emergency).  From and after the expiration of the Due Diligence Period and continuing thereafter through the Closing (provided this Agreement has not been terminated), Seller will not enter into any new contracts or any amendments or modifications to the existing contracts that will survive Closing without Purchaser's prior written consent, which consent may be withheld in Purchaser's sole and absolute discretion.  Seller shall provide Purchaser with copies of all contract proposals and new contracts upon the delivery or receipt thereof.

**7.2**     *Leases*.  From and after the Effective Date, Seller shall continue to operate and lease the Property in the ordinary course of business and consistent with past practice, provided,

that, in no event shall Seller alter, amend, modify, supplement or extend the term of any Lease or enter into any new Lease upon terms other than as provided on **Schedule 7.2** (attached hereto) without Purchaser's prior written consent.  Seller shall provide an updated rent roll depicting lease activity during the Due Diligence Period at least twenty-four (24) hours prior to the expiration of the Due Diligence Period for Purchaser's review.

       7.3    ***Proceedings***.  Seller shall promptly deliver notice to Purchaser, and prior to Closing, if the same may adversely affect the Property, defend at Seller's expense in the ordinary course of business and consistent with past practice, any action, litigation, arbitrations, mediation, reference, condemnation or other proceeding affecting the Property, or the use, possession or occupancy thereof.

       7.4    ***Operation in the Ordinary Course***.  From the Effective Date until the Close of Escrow, Seller shall (i) operate and manage the Property in the ordinary course and consistent with Seller's past practices and all applicable laws, (ii) maintain all casualty and liability insurance in place as' of the Effective Date with respect to the Property in amounts and with deductibles substantially the same as existing on the Effective Date, (iii) maintain all present services and amenities, (iv) maintain the Property in good condition, repair and working order, ordinary wear and tear excepted, and comply with all applicable laws and regulations, (v) keep on hand sufficient materials, supplies, equipment and other personal property for the efficient operation and management of the Property, and (vi) perform when due, and otherwise comply with, all of Seller's obligations and duties under the Leases and Service Contracts. None of the Personal Property shall be removed from the Land, unless replaced by unencumbered (other than Seller's first mortgage lien, which will be removed as of the Closing) personal property of equal or greater utility and value.

       7.5    ***Covenant Not to Convey or Encumber***.  From and after the Effective Date and continuing until the Closing (provided the Agreement has not been terminated), Seller shall not convey or encumber any portion of the Property or any rights therein, nor enter into any conveyance, security document, easement, or other agreement granting to any person or entity any rights with respect to the Property or any part thereof, or any interest whatsoever therein, or any option with respect thereto, without the prior written consent of Purchaser, which consent may be withheld in Purchaser's sole and absolute discretion.

       7.6    ***Keep Purchaser Informed***.  Seller shall endeavor to keep Purchaser informed as to the ongoing operations at the Property and to all material developments with respect to the Property (in each case, as soon as readily available after the Effective Date), including, providing Purchaser with (i) prompt notice of all new Leases and Service Contracts or modifications to existing Leases and Service Contracts entered into in accordance with the terms of this Agreement (together with copies thereof), and (ii) copies of all material third-party correspondence received or delivered with respect to the Property (including default notices under the Leases and Service Contracts but excluding correspondence with Seller's investor(s) and electronic mail other than electronic mail that constitutes formal contractual notice of default), promptly following receipt or delivery.

       7.7    ***Zoning***.  Initiate, consent to, approve or otherwise take any action with respect to the zoning, or any other governmental rule or regulation, presently applicable to all or any part of the Property; or

     **7.8**    *Press Releases*.  Issue any press release or other media publicity of any kind whatever with respect to this Agreement, or the transaction contemplated hereby, without the prior written consent of Purchaser.

**ARTICLE 8**
**CONDITIONS TO CLOSING**

     **8.1**    *Conditions to Purchaser's Obligations.*  Purchaser's obligation to close the purchase and sale of the Property is conditioned upon each of the foregoing conditions precedent:

          (a)    Title Insurer shall be irrevocably committed to issue to Purchaser an ALTA extended coverage Owner's Policy of Title Insurance with liability in the amount of the Purchase Price showing the Property vested in the name of Purchaser or Purchaser's nominee, subject only to the Permitted Exceptions.

          (b)    Seller shall have performed and observed in all material respects all covenants and agreements to be performed by Seller.

          (c)    All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the date of Closing subject to factual changes which do not materially affect the value of the Property.

          (d)    There shall be no violations of any applicable laws, statutes, codes, or ordinances pertaining to the Property which substantially affect the value of the Property.

     **8.2**    *Conditions to Seller's Obligations.*  Seller's obligation to close the purchase and sale of the Property is conditioned upon each of the foregoing conditions precedent:

          (a)    Purchaser shall have performed and observed in all material respects all covenants and agreements to be performed by Purchaser under this Agreement.

          (b)    All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the date of Closing.

**ARTICLE 9**
**CLOSING**

     **9.1**    *Time and Place.*  The consummation of the transaction contemplated hereby ("**Closing**") shall be completed through an escrow with Title Insurer on February 26, 2020 (i.e. the date that occurs fifty-one (51) days after the Effective Date) (the "**Closing Date**"). Notwithstanding the foregoing, Purchaser shall have the right upon written notice to Seller delivered not later than five (5) business days prior to the originally scheduled Closing Date to extend the Closing to March 12, 2020 (i.e. one period of fifteen (15) days) upon depositing with the Title Insurer the sum of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) (together with all interest earned thereon, the "**Extension Deposit**") on or prior to the Closing. The Extension Deposit shall be immediately non-refundable, except as otherwise set forth herein. The Extension Deposit shall apply to the Purchase Price.

-15-

**9.2     *Seller's Obligations at Closing.***  At Closing, Seller shall:

(a)     execute and deliver to Purchaser, in recordable form, a Special Warranty Deed in the form of ***Exhibit E*** (the "**Deed**"), conveying the Land and Improvements to Purchaser, subject only to the Permitted Exceptions;

(b)     execute and deliver to Purchaser a Bill of Sale in the form of ***Exhibit F*** (the "**Bill of Sale**"), conveying the Personal Property without warranty of title or use and without warranty, expressed or implied, as to merchantability and fitness for any particular purpose, subject only to the Permitted Exceptions;

(c)     execute and deliver to Purchaser the "**Assignment and Assumption**" of Leases in the form attached hereto as ***Exhibit G***, pursuant to which Seller will transfer and assign its interest in the Leases to Purchaser and Purchaser shall assume all obligations of Seller with respect thereto;

(d)     execute and deliver the "**Assignment and Assumption of Service Contracts**" in the form attached hereto as ***Exhibit H,*** pursuant to which Seller shall assign (to the extent its interests are assignable) its interest in the Service Contracts to Purchaser, and Purchaser shall assume all Seller's obligations with respect thereto;

(e)     execute and deliver the "**General Assignment of Intangibles**" in the form attached hereto as ***Exhibit I,*** pursuant to which Seller shall assign its interest in the Intangibles to Purchaser;

(f)     join with Purchaser in the execution of a Tenant Notice in the form of ***Exhibit J,*** which Purchaser shall send to each tenant at the Property (collectively, the 'Tenants" and each a "**Tenant**") under Leases, informing such Tenant of the sale of the Property and of the assignment to Purchaser of Seller's interest in, and obligations under, the Leases (including, if applicable any security deposits) and directing that all rent and other sums payable after the Closing under each such Lease shall be paid as set forth in the notice;

(g)     deliver to the Title Insurer such evidence as the Title Insurer may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

(h)     deliver to Purchaser a Certificate of Non-Foreign Status in the form of ***Exhibit K***, duly executed by Seller stating that Seller is not a "**foreign person**" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act;

(i)     cause the delivery, at the Property, of the Leases, Service Contracts and licenses and Permits, if any, in the possession of Seller or Seller's agents, together with such leasing and property files and records which are material in connection with the continued operation, leasing and maintenance of the Property;

(j)     deliver to Purchaser possession and occupancy of the Property, subject only to the Permitted Exceptions;

(k)     execute and deliver a closing statement (the "**Closing Statement**") for the purchase and sale of the Property; and

(l)     deliver such additional documents as shall be reasonably required by Purchaser or the Title Insurer or any other parties to consummate the transaction contemplated by this Agreement.

**9.3**     *Purchaser's Obligations at Closing.*  At Closing, Purchaser shall:

(a)     pay to Seller the full amount of the Purchase Price in the manner and subject to the adjustments and credits described in Section 9.4;

(b)     join Seller in execution of the instruments described in subsections 9.2(c), (d), (e), (f), (h), (k) and (l);

(c)     deliver to the Title Insurer such evidence as the Title Insurer may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser;

(d)     deliver such additional documents as shall be reasonably required to consummate the transaction contemplated by this Agreement.

**9.4**     *Credits and Prorations.*

(a)     The following shall be apportioned with respect to the Property as of 12:01 a.m. (local time at the Property), on the day of Closing, as if Purchaser were vested with title to the Property during the entire day upon which Closing occurs (except that if Escrow Agent does not receive the Purchase Price by receipt of wired funds and authorization from Purchaser to disburse the Purchase Price, as adjusted, to Seller by 3:00 P.M. Pacific Time on the day upon which Closing occurs, all prorations shall be made as of the following business day):

(i)     all paid rents and prepaid rents, if any, as and when collected (the term "**rents**" as used in this Agreement includes all payments due and payable by Tenants under the Leases);

(ii)     taxes (including personal property taxes on the Personal Property) and assessments levied against the Property;

(iii)     payments under the Service Contracts that are assumed by Purchaser, other than any prior payments made under any cable, internet, phone and/or telecommunications agreements (and Seller shall terminate and pay all fees due or payable under any Service Contracts not being assumed by Purchaser);

(iv)     the cost of gas, electricity, water, sewer, and other utility charges for which Seller is liable, if any, such charges to be apportioned at Closing on the basis of the most recent meter reading occurring prior to Closing (it being the intention of the parties that all meters

will be ready by the utility companies by the close of business on the day immediately prior to Closing).

(v)     any other operating expenses, pre-paid expenses, or other items of expense pertaining to the Property.

(b)     Notwithstanding anything contained in the foregoing provisions:

(i)     At Closing, (A) Seller shall deliver to Purchaser any refundable security deposits actually held by or obligated to be held by Seller pursuant to the Leases, and (B) Seller shall be entitled to receive and retain such refundable cash and deposits posted with Utility Companies.

(ii)     City, state and county real property taxes and all assessments and personal property taxes payable during the calendar year of Closing shall be prorated based on the ad valorem tax bills for the Property for such period, if any.  All real property taxes will include all city, state, county, and school district ad valorem taxes and special assessments based on the current property tax bills for the Property.  Seller shall cause to be paid at the Closing, the prorated portion of any improvement lien assessments, levied and pending special assessments, delinquent assessments due under any covenants, conditions and restrictions or similar documents affecting the Land and/or Improvements, and any other special taxing district assessments against the Property.  If the amount of any such taxes is not ascertainable on the Closing date, the proration for such taxes shall be based on the most recent available bill; provided, however, that after the Closing, the Seller and Purchaser shall reprorate the taxes and pay any deficiency in the original proration to the other party promptly upon receipt of the actual bill for the relevant taxable period. In the event that the Property or any part thereof shall be or shall have been affected by an assessment or assessments by federal, state or municipal agencies, whether or not the same become payable in annual installments, the Seller shall, at the Closing, be responsible for any installments due prior to the Closing and Purchaser shall be responsible for any installments due on or after the Closing.  Additionally, Purchaser understands and agrees that if Seller is currently in litigation, formal challenge or appeal for the purposes of challenging ad valorem property tax liability for the period of Seller's ownership of the Property or some portion thereof, whether said formal challenge is to assessed value, tax rate or otherwise, Seller shall be entitled (i) to continue said litigation, formal challenge or appeal until a final, un-appealable judgment is reached, and to remain the party responsible for the same despite Purchaser's ownership of the Property after Closing, and (ii) to recoup the full amount of any reimbursement for property tax payments attributable to the period occurring prior to Closing (including that portion of 2020 prior to Closing) in the event Seller's efforts directly or indirectly lead to a decreased tax liability with the applicable office or offices that establish ad valorem property taxes.   In the event any such reimbursement funds are transmitted to Purchaser, Purchaser shall remit the same to Seller within seven (7) business days. Purchaser agrees to cooperate in good faith with any on-going efforts of Seller as described herein, provided Purchaser shall not be obligated to expend money or undergo actions detrimental to the use or value of the Project.  Nothing in this paragraph 6.5 shall require or obligate Seller to continue or commence litigation, formal challenge or appeal of property taxes; it shall be in Seller's sole discretion whether to engage in such action(s).   The reproration obligation and property tax challenge mechanics under this subsection 9.4(b)(ii) shall survive the Closing without limitation.

In addition, if after the Closing there is an adjustment or reassessment by any governmental authority for the year of the Closing or any prior year (whether in the nature of a "**roll-back**" tax or otherwise), any additional tax payment assessed on the Property will be paid by Seller.  If it is known, as of the date of Closing, that a so-called "**roll-back**" tax will be assessed after Closing, the estimated amount of the "**roll-back**" taxes will be escrowed with the Title Insurer at Closing.  The taxes will then be paid by the Title Insurer when actually assessed and Seller agrees to pay its share of any shortfall in the estimate, if applicable.

(iii)    The Personal Property is included in this sale, without further charge.

(iv)    Purchaser shall deliver to Seller (together with a detailed billing report with respect to the same) within ninety (90) days after the date of Closing the amount of all tenant reimbursements due and payable by tenants after the Closing with respect to costs incurred by Seller prior to Closing for the provision of utilities, gas, electricity, water and sewer to the Property, if any.

(v)    Purchaser will make a good faith effort after Closing to collect all rents, reimbursements and any and all other amounts due and payable by the tenants at the Property in the usual course of Purchaser's operation of the Property, but Purchaser will not be obligated to institute any lawsuit or other collection procedures to collect delinquent rents.  Unpaid and delinquent rent collected by Seller after the date of Closing shall be delivered, without setoff or deduction, within two (2) business days after the receipt thereof, to Purchaser.  Additionally, Seller and Purchaser agree that all unpaid and delinquent rent received by Purchaser shall first be applied to rents that became due on or after the date of Closing, with anything remaining being paid to Seller with respect to rent that was due but unpaid as of the Closing.

(c)    Those items for which actual bills are not available at Closing, shall be prorated based upon the good faith estimates or the previous month's or year's bill(s), as applicable.

(d)    All apartment units within the Improvements that are vacant as of the date which is five (5) business days prior to Closing shall be made "rent ready" by Seller prior to Closing; provided, that if Seller fails to do so (and as Buyer's sole remedy for such failure), Buyer shall receive a credit against the Purchase Price of $1,000.00 for each such unit which is not in rent ready condition as of the Closing.

(e)    Other expenses relating to the Property as of 12:01 A.M. on the day of Closing and all periods thereafter, including those required by any assumed contract or agreement for any services to the Property and those incurred or ordered by Seller or Seller's agents which are transferred to and assumed by Purchaser will be paid for by Purchaser and Seller shall not have any liability for such costs.

(f)    The provisions of this Section 9.4 shall survive the Closing for a period of twelve (12) months.

-19-

**9.5**     ***Closing Costs.***

(a)     Seller shall pay or reimburse Purchaser for:

(i)     one-half of any escrow fees charged by the Title Insurer;

(ii)     all costs incurred to defease, repay or satisfy any liens that the Seller is obligated to remove or has otherwise previously agreed, in writing, to satisfy prior to Closing, including all recording fees relating thereto;

(iii)     any termination fees associated with the Rejected Service Contracts;

(iv)     any transfer or assignment fees on transferable licenses and Permits;

(v)     all real estate transfer or documentary stamp taxes;

(vi)     all real estate brokerage commissions payable for services provided by Jeff Rowerdink with Berkadia as outlined in a separate agreement between Seller and Berkadia;

(vii)     the costs for an owner's policy of title insurance on the Property in the amount of the Purchase Price including any waivers of pre-printed exceptions or shortages of area, and affirmative covenants over exceptions otherwise not acceptable to Purchaser; and

(viii)     all other expenses due or incurred by Seller in connection with this transaction customarily paid by sellers in Texas.

(b)     Purchaser shall pay:

(i)     all recording costs and fees relating to the recordation of the Deed and any mortgage obtained by Purchaser, including any state, county or other recordation taxes or similar charges relating thereto;

(ii)     all costs associated with any financing obtained by Purchaser, including any costs associated with its lender's title insurance policy;

(iii)     all costs associated with Purchaser's investigation of the Property, including, without limitation, costs associated with environmental investigations and reports, and expenses and engineering expenses;

(iv)     the costs of any endorsements to the owner's or lender's title insurance policy (other than endorsements required to insure over items Seller has agreed to insure over);

(v)     one-half of any escrow fees charged by the Title Insurer and all other costs, expenses and charges by the Title Company for conducting the closing; and

(vi)     all other expenses due or incurred by Purchaser in connection with this transaction customarily paid by purchasers in Texas.

      (c)     Seller and Purchaser shall each pay the fees of their respective attorneys incurred in connection with this transaction.

## ARTICLE 10
## DEFAULT

**10.1**   ***Default by Purchaser.***  If Purchaser breaches, defaults or fails to perform its obligations under this Agreement which breach, default or failure is not cured within ten (10) business days after delivery of written notice thereof to Purchaser, and Seller has not breached, defaulted or failed to perform its obligations under this Agreement, then, as Seller's sole and absolute remedy, to the exclusion of all other remedies including, without limitation, specific performance, the Earnest Money shall be paid to Seller, in which case the Earnest Money shall constitute the entire liquidated damages of Seller and Purchaser shall thereupon be relieved of all further obligations and liabilities arising out of this Agreement, it being agreed that the actual damages of Seller are difficult or impossible to ascertain and that said Earnest Money represents the parties best estimate of the actual damages of Seller.  Notwithstanding, the foregoing is not intended to limit Purchaser's surviving obligations under this Agreement, including any obligation of Purchaser to indemnify Seller.  Nothing in this Section 10.1 excuses Purchaser from making the Earnest Money deposits when required pursuant to this Agreement.

**10.2**   ***Default by Seller.***  In the event Seller breaches, defaults or fails to perform its obligations under this Agreement for any reason other than Purchaser's default or the permitted termination of this Agreement by Seller or Purchaser as herein expressly provided, and such breach, default or failure is not cured within ten (10) business days after delivery of written notice thereof to Seller, Purchaser, as its sole and exclusive remedy, shall be entitled to either:  (i) receive the return of the Earnest Money, which return shall operate to terminate this Agreement and release Seller from any and all liability hereunder, and, within two (2) business days of written demand therefor, receive full reimbursement from Seller of all actual and verifiable out-of-pocket costs, expenses and fees (including reasonable attorneys' fees) incurred by Purchaser as a result of its due diligence on the Property, negotiation of this Agreement, and obtaining financing (or a commitment therefor) in an amount not to exceed $100,000.00, or (ii) seek specific performance of this Agreement.  The provisions of this Article 10 shall survive the termination of this Agreement and the Closing.

## ARTICLE 11
## RISK OF LOSS

**11.1**   ***Minor Damage.***  In the event of loss or damage to the Property or any portion thereof which is not "**major**" (as hereinafter defined), this Agreement shall remain in full force and effect provided Seller performs any necessary repairs or, at Seller's option, assigns to Purchaser all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies or condemnation awards relating to the premises in question.  If Seller elects to perform repairs upon the Property, Seller shall use reasonable efforts to complete such repairs promptly and the date of Closing shall be extended a reasonable time in order to allow for the completion of such repairs.  If Seller elects to assign a casualty claim to Purchaser, the Purchase Price shall be reduced by an amount equal to the deductible amount under

Seller's insurance policy.  Upon Closing, full risk of loss with respect to the Property shall pass to Purchaser.

**11.2     *Major Damage.***   In the event of a "**major**" loss or damage, Purchaser may terminate this Agreement by written notice to Seller, in which event the Earnest Money shall be returned to Purchaser.  If Purchaser does not elect to terminate this Agreement within ten (10) business days after Seller sends Purchaser written notice of the occurrence of major loss or damage, then Purchaser shall be deemed to have elected to proceed with Closing, in which event Seller shall, at Seller's option, either (a) perform any necessary repairs, or (b) assign to Purchaser all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies or condemnation awards relating to the portion of the Property in question, together with cash equal to the amount of any deductible relating thereto.  If Seller elects to perform repairs upon the Property, Seller shall use reasonable efforts to complete such repairs promptly and the date of Closing shall be extended a reasonable time in order to allow for the completion of such repairs.  If Seller elects to assign a casualty claim to Purchaser, the Purchase Price shall be reduced by an amount equal to the deductible amount under Seller's insurance policy.  Upon Closing, full risk of loss with respect to the Property shall pass to Purchaser.

**11.3     *Definition of "Major" Loss or Damage.***   For purposes of Sections 11.1 and 11.2, "**major**" loss or damage refers to the following:  (i) loss or damage to the Property or any portion thereof such that the cost of repairing or restoring the portion of the Property in question to a condition substantially identical to that of the premises in question prior to the event of damage would be, in the opinion of an architect selected by Seller and approved by Purchaser, equal to or greater than $1,500,000, and (ii) any loss due to a condemnation which permanently and materially impairs the current use of the Property.  If Purchaser does not give notice to Seller of Purchaser's reasons for disapproving an architect within ten (10) business days after receipt of notice of the proposed architect, Purchaser shall be deemed to have approved the architect selected by Seller.

## ARTICLE 12
## BROKERAGE COMMISSIONS

Seller represents and warrants that, other than Jeff Rowerdink with Berkadia (who shall be paid a commission by Seller pursuant to a separate written agreement), it has not dealt with any investment adviser, real estate broker or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker or finder, in connection with the sale of the Property to Purchaser or this Agreement.  Seller hereby agrees to indemnify and hold Purchaser harmless from and against any and all claims for brokerage or finder's fees or other similar commissions or compensation made by any and all brokers or finders claiming to have dealt with Seller in connection with this Agreement or the consummation of the transaction contemplated hereby. Purchaser represents and warrants that, other than Jeff Rowerdink with Berkadia, it has not dealt with any investment adviser, real estate broker or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker or finder, in connection with the purchase of the Property or this Agreement.  Purchaser hereby agrees to indemnify and hold Seller harmless from and against any and all claims for brokerage or finder's fees or other similar commissions or compensation made by any and all brokers or finders claiming to have dealt with Purchaser in connection with this Agreement or the consummation of the transaction contemplated

hereby. The foregoing indemnities are a material inducement to the parties entering into this Agreement and shall survive Closing until the expiration of the statute of limitations period within which any such investment adviser, real estate broker or finder must assert its claim to such fee or commission or forever be barred.

**ARTICLE 13**
**ESCROW**

**13.1** *Escrow Agent.* The Title Insurer has agreed to act as escrow agent for the convenience of the parties (the "**Escrow Agent**").

**ARTICLE 14**
**MISCELLANEOUS**

**14.1** *Confidentiality.* Purchaser and its representatives shall hold in confidence all data and information obtained with respect to Seller, its business, or the Property that is not otherwise available to the public, whether obtained before or after the execution and delivery of this Agreement, and shall not disclose the same to others; provided, however, it is understood and agreed that Purchaser may disclose such data and information to Purchaser's Lender and to the employees, consultants, accountants, investors, partners, and attorneys of Purchaser. In the event this Agreement is terminated or Purchaser fails to perform hereunder, Purchaser shall promptly return to Seller any statements, documents, schedules, exhibits or other written information obtained from Seller in connection with this Agreement or the transaction contemplated herein, together with copies of any and all studies, reports, plans, financial projections, title reports, surveys or other documents prepared by or for Purchaser in connection with its proposed acquisition of the Property (all at no cost or expense to Seller, but without any representation or warranty as to Seller's right to use any such materials). This Section 14.1 shall survive termination or Closing for a period of six (6) months.

**14.2** *Public Disclosure.* Any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement will be made only in the form approved by Purchaser and Seller and their respective counsel.

**14.3** *Discharge of Obligations.* The delivery and acceptance of the Deed by Seller and Purchaser shall be deemed to be a full performance and discharge of every representation and warranty made by Purchaser and Seller herein and every agreement and obligation on the part of Purchaser and Seller to be performed pursuant to the provisions of this Agreement, except those which are herein specifically stated to survive Closing.

**14.4** *Assignment.* Purchaser may assign its rights under this Agreement to an affiliate of Purchaser or an entity controlling, controlled by, or under common control with Purchaser pursuant to an agreement whereby the assignee expressly assumes all of the obligations of the originally named Purchaser; provided, however, that Purchaser originally named herein shall remain jointly and severally liable for all of the obligations of the Purchaser under this Agreement. Purchaser shall give Seller written notice of any such assignment together with a copy of the assignment document.

-23-

**14.5    *Notices.***   Any notice pursuant to this Agreement shall be given in writing by (a) internet e-mail with conforming copy sent by other means, or (b) personal delivery, or (c) reputable overnight delivery service with proof of delivery, or (d) United States Mail, postage prepaid, certified mail, return receipt requested, sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of an email transmission, as of the date of the email transmission (or next business day if transmitted on a day other than a business day) provided that an original of such email is also sent to the intended addressee by means described in clauses (b), (c) or (d) above.  Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

|  |  |
|---|---|
| If to Seller: | WG Monterrey Venture LLC<br>c/o The Garrett Companies<br>1051 Greenwood Springs Blvd., Suite 101<br>Greenwood, Indiana 46143<br>Attn:  Eric Garrett<br>Tel:  (317) 743-5995<br>Email:  Eric@TheGarrettCo.com |
| with a copy to: | WG Monterrey Venture LLC<br>c/o The Garrett Companies<br>1051 Greenwood Springs Blvd., Suite 101<br>Greenwood, Indiana 46143<br>Attn:  Kyle McClammer<br>Tel:  (317) 743-8591<br>Email:  Eric@TheGarrettCo.com |
| If to Purchaser: | Dornin Investment Group<br>6725 Via Austi Parkway, Suite 380<br>Las Vegas, Nevada 89119<br>Attn:  Chris Dornin<br>Email:  chris@dorningroup.com |
| With Copy to: | Allen Matkins<br>865 South Figueroa Street, Suite 2800<br>Los Angeles, California 90017<br>Attn:  Mark Nicoletti, Esq.<br>Tel:  (213) 955-5517<br>Email:  mnicoletti@allenmatkins.com |

1190996/LA

Escrow Agent:     Fidelity National Title
4400 MacArthur Boulevard, Suite 200
Newport Beach, California 92660
Attn:  Valerie Rapp
Tel:  (949) 477-3646
Email:  Valerie.Rapp@fnt.com

**14.6    *Modifications.***   This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such executory agreement is in writing and is signed by the parties hereto.

**14.7    *Calculation of Time Periods.***   Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State in which the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday or legal holiday.  The final day of any such period shall be deemed to end at 5 p.m. Pacific Time.

**14.8    *Successors and Assigns.***   The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto.

**14.9    *Entire Agreement.***   This Agreement, including the Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

**14.10   *Further Assurances.***   Each party agrees that it will without further consideration execute and deliver such other documents (including acknowledgments of receipt) and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement.  The provisions of this Section 14.10 shall survive Closing.

**14.11   *Counterparts.***   This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart in proving this Agreement.

**14.12   *Severability.***   If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

**14.13   *Applicable Law.***   This Agreement is performable in the state in which the Property is located and shall in all respects be governed by, and construed in accordance with, the substantive federal laws of the United States and the laws of such state.  Seller and Purchaser hereby irrevocably submit to the jurisdiction of any state or federal court sitting in the state in which the Property is located in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agree that all claims in respect of such action or proceeding

-25-

shall be heard and determined in a state or federal court sitting in the state in which the Property is located.  Purchaser and Seller agree that the provisions of this Section 14.13 shall survive the Closing.

**14.14   *Jury Trial Waiver.***  EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH SELLER AND/OR PURCHASER MAY BE PARTIES ARISING OUT OF, IN CONNECTION WITH, OR IN ANY WAY PERTAINING TO THIS AGREEMENT.  THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE PARTIES AND EACH HEREBY REPRESENTS AND WARRANTS TO THE OTHER THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.  EACH PARTY FURTHER REPRESENTS AND WARRANTS TO THE OTHER THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OF ITS OWN FREE WILL, AND HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.  THE PROVISIONS OF THIS SECTION SHALL SURVIVE CLOSING OR THE TERMINATION OF THIS AGREEMENT.

**14.15   *Counsel.***  EACH PARTY HERETO WARRANTS AND REPRESENTS THAT EACH PARTY HAS BEEN AFFORDED THE OPPORTUNITY TO BE REPRESENTED BY COUNSEL OF ITS CHOICE IN CONNECTION WITH THE EXECUTION OF THIS AGREEMENT AND HAS HAD AMPLE OPPORTUNITY TO READ, REVIEW, AND UNDERSTAND THE PROVISIONS OF THIS AGREEMENT.

**14.16   *Equal Participation.***  SELLER AND PURCHASER HAVE PARTICIPATED EQUALLY IN THE PREPARATION OF THIS AGREEMENT, AND, THEREFORE, THIS AGREEMENT AND EACH PROVISION THEREOF SHALL NOT BE CONSTRUED IN FAVOR OF OR AGAINST ANY PARTY TO THIS AGREEMENT BY REASON OF ONE PARTY'S BEING DEEMED TO HAVE PREPARED THIS AGREEMENT OR IMPOSED SUCH PROVISION.

**14.17   *No Third-Party Beneficiary.***  The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third-party, and accordingly, no third-party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

**14.18   *Captions.***  The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

**14.19   *Construction.***  The parties acknowledge that they and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

**14.20**   *Termination of Agreement.*   It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Seller and Purchaser from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.   Additionally, except as otherwise expressly stated herein, the provisions, terms and conditions in this Agreement shall merge into the Deed upon Closing and expire therewith.

**14.21**   *Exculpation.*   Notwithstanding anything to the contrary contained in this Agreement or in any exhibits attached hereto or in any documents executed in connection herewith (collectively, including this Agreement, said exhibits and any such document, the "**Purchase Documents**"), it is expressly understood and agreed by and between the parties hereto that no personal liability or personal responsibility of any sort with respect to any of Seller's or Purchaser's respective duties or obligations hereunder is assumed by, or shall at any time be asserted or enforceable against, Seller, Purchaser or their respective affiliates, or against any of their respective shareholders, directors, officers, employees, agents, advisors, constituent partners, members, managers, beneficiaries, trustees or representatives.

**14.22**   *TIME OF THE ESSENCE.*   TIME IS OF THE ESSENCE IN THIS AGREEMENT.

**14.23**   *Subcontractor and Supplier Warranties.*   With respect to any warranty or guaranty assigned by the terms and conditions of this Agreement or the General Assignment of Intangibles (collectively, the "Subcontractor Warranties"), upon written notice from Purchaser of a warranty or guarantee claim under one or more of the Subcontractor Warranties, Seller shall use good faith efforts to facilitate the claims-making process of Purchaser; provided, however, Seller shall not be obligated to expend money or incur costs or fees, including attorneys' fees, in exercising such good faith effort.   This Section 14.23 shall survive Closing.

**14.24**   *1031 Exchange*.   Seller and Buyer acknowledge that either party may wish to structure this transaction as a tax deferred exchange of like-kind property within the meaning of Section 1031 of the Internal Revenue Code and each party agrees to reasonably cooperate with the other party to effect such an exchange.   Buyer shall be permitted to assign this Agreement to any "qualified intermediary" to effect an Internal Revenue Code Section 1031 deferred like kind exchange of properties.   Seller agrees to cooperate with Buyer and Buyer's qualified intermediary to effect any such exchange of Property, however, Seller shall not be obligated to spend any additional time or money or incur any liability in so cooperating.   This Agreement is not subject to or conditioned upon the Buyer's ability to dispose of a relinquished property or to effectuate an exchange.   Further, any such exchange shall be effected by such qualified intermediary in such a manner that title to the property is directly deeded from the Seller to the Buyer.

**[*THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK; SIGNATURES TO FOLLOW*]**

    **IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the Effective Date.

                    **SELLER:**

                    **WG MONTERREY VENTURE LLC**,
                    a Delaware limited liability company

                    By:    Garrett Partners IV, LLC
                              an Indiana limited liability company,
                              its Manager

                            By:  _____
                                Eric Garrett, Manager

                    **PURCHASER:**

                    **DORNIN INVESTMENT GROUP, LLC**,
                    a Delaware limited liability company

                    By:  _____
                        Chris Dornin, President

## JOINDER OF ESCROW AGENT

Escrow Agent has executed this Agreement in order to confirm that Escrow Agent shall strictly comply with the provisions of this Agreement relating to Escrow Agent's duties.

Dated: December  31  , 2019

**ESCROW AGENT:**

**FIDELITY NATIONAL TITLE COMPANY**

By: _____
Name: Valerie Rapp
Title:  VP

**SCHEDULE OF EXHIBITS:**

SCHEDULE 7.2     MARKET LEASE TERMS

EXHIBIT A     LEGAL DESCRIPTION OF THE LAND

EXHIBIT B     SERVICE CONTRACTS SCHEDULE

EXHIBIT C     RENT ROLL

EXHIBIT D     FORM OF DEED

EXHIBIT E     FORM OF BILL OF SALE

EXHIBIT F     FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES

EXHIBIT G     FORM OF ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS

EXHIBIT H     GENERAL ASSIGNMENT OF INTANGIBLES

EXHIBIT I     FORM OF TENANT NOTICE

EXHIBIT J     FORM OF CERTIFICATE OF NON-FOREIGN STATUS

**SCHEDULE 7.2**
**MARKET LEASE TERMS**

| TYPE | Floorplan | # of Units | SF | Rent | Concession |
|------|-----------|------------|------|--------|------------|
| 1B1B | A1 | 10 | 757 | $1,165 | One Month Free On A 13 Month Lease |
| 1B1B | A1G | 10 | 757 | $1,265 | One Month Free On A 13 Month Lease |
| 1B1B | A2 | 10 | 859 | $1,245 | 2 Weeks Free On A 13 Month Lease |
| 1B1B | A2G | 10 | 859 | $1,445 | One Month Free On A 13 Month Lease |
| 1B1B | A3 | 20 | 769 | $1,050 | One Month Free On A 13 Month Lease |
| 1B1B | A4 | 20 | 954 | $1,099 | One Month Free On A 13 Month Lease |
| 1B1B | A4G | 20 | 954 | $1,199 | 2 Weeks Free On A 13 Month Lease |
| 2B2B | B1 | 20 | 1,024 | $1,299 | One Month Free On A 13 Month Lease |
| 2B2B | B2 | 20 | 1,084 | $1,500 | One Month Free On A 13 Month Lease |
| 2B2B | B2G | 20 | 1,084 | $1,550 | One Month Free On A 13 Month Lease |
| 2B2B | B3 | 10 | 1,299 | $1,475 | One Month Free On A 13 Month Lease |
| 2B2B | B3G | 10 | 1,299 | $1,625 | One Month Free On A 13 Month Lease |
| 2B2B | B4 | 10 | 1,389 | $1,525 | One Month Free On A 13 Month Lease |
| 2B2B | B4G | 10 | 1,389 | $1,625 | One Month Free On A 13 Month Lease |
| 3B2B | C1 | 10 | 1,376 | $1,625 | One Month Free On A 13 Month Lease |
| 3B2B | C1G | 10 | 1,376 | $1,699 | One Month Free On A 13 Month Lease |
| 3B2B | C2 | 10 | 1,477 | $1,699 | One Month Free On A 13 Month Lease |
| 3B2B | C2G | 10 | 1,477 | $1,750 | One Month Free On A 13 Month Lease |

*EXHIBIT A*

*LEGAL DESCRIPTION OF THE LAND*

Lot 10, Block 8, New City Block 19127, ECHELON AT MONTERREY VILLAGE MPCD, a subdivision in Bexar County, Texas, according to the map or plat thereof, recorded in Volume 9695, Page 143 of the Deed and Plat Records of Bexar County, Texas.

***EXHIBIT B***

***SERVICE CONTRACTS SCHEDULE***

| Contractor Name | Service Description |
|---|---|
| Realpage | Answering Service |
| Bizdoc | Copier/Printer Lease |
| Gratr | Landscaping |
| *AT&T* | *Phone, Internet, Cable* |
| Ecoteam | Pest Control |
| Parks Coffee | Coffee Service |
| Waste Management | Waste Mgmt |
| GSC Monitoring | Fire Monitoring |
| Pool Sure | Pool service |
| River City Pool Service | Monthly pool cleaning and chemical testing |

1190996/LA

*EXHIBIT C*

*RENT ROLL*

*(to be attached)*

EXHIBIT C
-1-

# Rent Roll

Echelon at Monterey Village (4810)

As Of = 12/31/2020

Month Year = 12/2019

## Current/Notice/Vacant Residents

| Unit | Unit Type | Sq Ft | Unit Resident | Name | Market Rent | Actual Rent | Resident Deposit | Other Deposit | Move In | Lease Expiration | Move Out | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01101 | 4810-c1 | 1,376.00 | 00056620 | Just Like Home | 1,750.00 | 1,614.00 | 0.00 | 0.00 | 04/23/2018 | 06/08/2018 | | 0.00 |
| 01102 | 4810-a1 | 757.00 | 00088878 | Jennifer Garibay | 1,165.00 | 1,005.00 | 400.00 | 0.00 | 10/26/2019 | 10/31/2020 | | 0.00 |
| 01103 | 4810-b3 | 1,299.00 | 00401784 | Sean Fenton | 1,575.00 | 1,500.00 | 0.00 | 0.00 | 09/07/2018 | 10/26/2020 | | 0.00 |
| 01105 | 4810-b1 | 1,024.00 | MODEL | MODEL | 1,475.00 | 0.00 | | 0.00 | | | | 0.00 |
| 01108 | 4810-a3 | 769.00 | 00398852 | Aaliyah Vargas | 1,070.00 | 950.00 | 0.00 | 0.00 | 10/31/2018 | 11/02/2020 | | 0.00 |
| 01110 | 4810-a3 | 769.00 | 00387489 | Marc Hartline | 1,070.00 | 989.00 | 0.00 | 0.00 | 07/27/2018 | 09/28/2020 | | 0.00 |
| 01113 | 4810-b1 | 1,024.00 | 00065753 | Just Like Home | 1,475.00 | 1,350.00 | 0.00 | 0.00 | 08/03/2018 | 06/01/2020 | | 0.00 |
| 01204 | 4810-b4 | 1,389.00 | 0294587 | Anibal Martinez | 1,650.00 | 1,540.00 | 0.00 | 0.00 | 09/07/2018 | 03/09/2020 | | -1,676.71 |
| 01206 | 4810-b2 | 1,084.00 | 00097289 | Jennifer Smith-Steiner | 1,500.00 | 1,200.00 | 400.00 | 0.00 | 10/10/2019 | 10/12/2020 | | -1,013.51 |
| 01207 | 4810-a4 | 954.00 | 0104964 | Jorge Baez | 1,260.00 | 1,099.00 | 0.00 | 0.00 | 12/20/2019 | 01/31/2021 | | -1,156.68 |
| 01209 | 4810-a2 | 859.00 | 0238801 | Rita Celedon | 1,245.00 | 1,099.00 | 0.00 | 0.00 | 08/10/2017 | 08/17/2020 | | 0.00 |
| 01211 | 4810-a4 | 954.00 | 0094084 | Abdulrahman Bahri | 1,260.00 | 1,195.00 | 0.00 | 0.00 | 08/22/2019 | 05/25/2020 | | 0.00 |
| 01212 | 4810-b2 | 1,084.00 | 0097003 | Victor Buonomo | 1,500.00 | 1,200.00 | 400.00 | 0.00 | 10/05/2019 | 09/30/2020 | | 0.00 |
| 01214 | 4810-c2 | 1,477.00 | 0445427 | Jessie Ramirez | 1,799.00 | 1,599.00 | 0.00 | 0.00 | 01/04/2019 | 01/06/2020 | 01/06/2020 | 0.00 |
| 02101 | 4810-c1g | 1,376.00 | 0389654 | Luz Martinez | 1,850.00 | 1,699.00 | 0.00 | 0.00 | 07/13/2018 | 03/02/2020 | | 0.00 |
| 02102 | 4810-a1g | 757.00 | 0083510 | Matthew Hollingsworth | 1,265.00 | 1,265.00 | 0.00 | 0.00 | 07/11/2019 | 07/13/2020 | | 0.00 |
| 02103 | 4810-b3g | 1,299.00 | 0097880 | PATRICIA CORTINAS | 1,625.00 | 1,499.00 | 0.00 | 0.00 | 10/22/2019 | 10/31/2020 | | 0.00 |
| 02104 | 4810-b4g | 1,389.00 | 0042993 | Christopher Robinson | 1,750.00 | 0.00 | 0.00 | 0.00 | 08/23/2017 | 10/26/2020 | 12/31/2019 | 50.00 |
| 02206 | 4810-b2g | 1,084.00 | 0082180 | Thomas Gaylord | 1,550.00 | 1,550.00 | 0.00 | 0.00 | 04/28/2019 | 04/27/2020 | | 0.00 |
| 02207 | 4810-a4g | 954.00 | 0102141 | Vicente Santos Jr | 1,325.00 | 1,199.00 | 0.00 | 0.00 | 12/16/2019 | 01/31/2021 | | -575.33 |
| 02209 | 4810-a2g | 859.00 | 0086627 | Christopher Poore | 1,445.00 | 1,049.00 | 400.00 | 0.00 | 08/28/2019 | 08/31/2020 | | 0.00 |
| 02211 | 4810-a4g | 954.00 | 0102597 | Feliciano Lopez | 1,325.00 | 1,199.00 | 0.00 | 0.00 | 12/01/2019 | 12/31/2020 | | 0.00 |
| 02212 | 4810-b2g | 1,084.00 | 0416654 | Victoria Vu | 1,550.00 | 1,581.00 | 0.00 | 0.00 | 10/05/2018 | 09/07/2020 | | -1,660.23 |
| 02214 | 4810-c2g | 1,477.00 | VACANT | VACANT | 1,899.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 03101 | 4810-c1 | 1,376.00 | 0100505 | Miguel Martinez | 1,750.00 | 1,625.00 | 0.00 | 0.00 | 11/01/2019 | 12/07/2020 | 01/31/2020 | 1,863.73 |
| 03102 | 4810-a1 | 757.00 | 0086805 | Flor Cruz | 1,165.00 | 949.00 | 400.00 | 0.00 | 06/29/2019 | 06/29/2020 | | -1,020.33 |
| 03103 | 4810-b3 | 1,299.00 | 0441467 | Travis Kaja | 1,575.00 | 1,550.00 | 0.00 | 0.00 | 10/25/2018 | 11/02/2020 | | 0.00 |
| 03105 | 4810-b1 | 1,024.00 | VACANT | VACANT | 1,475.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 03108 | 4810-a3 | 769.00 | 0097340 | Abdulla Al-khulaifi | 1,070.00 | 1,049.00 | 0.00 | 0.00 | 10/06/2019 | 04/05/2020 | | 0.00 |
| 03110 | 4810-a3 | 769.00 | VACANT | VACANT | 1,070.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 03113 | 4810-b1 | 1,024.00 | 0075574 | Elvia Garza | 1,475.00 | 1,399.00 | 0.00 | 0.00 | 02/23/2019 | 02/24/2020 | | 0.00 |
| 03204 | 4810-b4 | 1,389.00 | 0071011 | Mohammed Alnaimi | 1,650.00 | 1,650.00 | 0.00 | 0.00 | 12/14/2018 | 11/25/2019 | | 75.00 |
| 03206 | 4810-b2 | 1,084.00 | 0091510 | Thamer Mohammed | 1,500.00 | 1,500.00 | 400.00 | 0.00 | 08/06/2019 | 08/03/2020 | | -1,570.50 |
| 03207 | 4810-a4 | 954.00 | VACANT | VACANT | 1,260.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 03209 | 4810-a2 | 859.00 | 0086725 | Ariel Cruz | 1,245.00 | 999.00 | 0.00 | 0.00 | 08/14/2019 | 08/17/2020 | | 0.00 |
| 03211 | 4810-a4 | 954.00 | 0043220 | Gregory Pinnekins | 1,260.00 | 1,121.00 | 0.00 | 0.00 | 08/01/2017 | 08/17/2020 | | 0.00 |
| 03212 | 4810-b2 | 1,084.00 | 0067416 | Shania Thomas | 1,500.00 | 1,300.00 | 0.00 | 0.00 | 09/15/2018 | 11/30/2020 | | 0.00 |
| 03214 | 4810-c2 | 1,477.00 | 0069091 | Aurora Lozano | 1,799.00 | 1,640.00 | 0.00 | 0.00 | 11/15/2018 | 12/28/2020 | | 0.00 |

# Rent Roll

Echelon at Monterey Village (4810)

As Of = 12/31/2020

Month Year = 12/2019

| Unit | Unit Type | Unit Resident Sq Ft | Name | Market Rent | Actual Rent | Resident Deposit | Other Deposit | Move In | Lease Expiration | Move Out | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04101 | 4810-c1g | 1,376.00 00099927 | Theresa Williams | 1,850.00 | 1,499.00 | 0.00 | 0.00 | 11/02/2019 | 12/07/2020 | | 0.00 |
| 04102 | 4810-a1g | 757.00 00067417 | Alejandro Ruiz | 1,265.00 | 1,265.00 | 0.00 | 0.00 | 06/20/2019 | 06/22/2020 | | -1,334.15 |
| 04103 | 4810-b3g | 1,299.00 00354320 | Philomene Balihe | 1,625.00 | 1,535.00 | 0.00 | 0.00 | 06/22/2018 | 06/29/2020 | | 0.0% |
| 04204 | 4810-b4g | 1,389.00 00042727 | Justin Contreras | 1,750.00 | 1,750.00 | 0.00 | 0.00 | 06/24/2019 | 06/29/2020 | | 0.00 |
| 04206 | 4810-b2g | 1,084.00 00071770 | Jeaneen Spears | 1,550.00 | 1,500.00 | 0.00 | 0.00 | 02/17/2019 | 02/29/2020 | | 0.00 |
| 04207 | 4810-a4g | 954.00 02102159 | DaNae Vazquez | 1,325.00 | 1,099.00 | 0.00 | 0.00 | 11/26/2019 | 03/01/2021 | | 0.07 |
| 04209 | 4810-a2g | 859.00 00095717 | Anthony Johnson | 1,445.00 | 1,200.00 | 0.00 | 0.00 | 11/07/2019 | 11/02/2020 | | 0.00 |
| 04211 | 4810-a4g | 954.00 02102155 | Taylor Keown | 1,325.00 | 1,199.00 | 400.00 | 0.00 | 11/22/2019 | 12/21/2020 | | -1,164.00 |
| 04212 | 4810-b2g | 1,084.00 VACANT | VACANT | 1,550.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 04214 | 4810-c2g | 1,477.00 0101893 | Sandra Lopez | 1,899.00 | 1,775.00 | 0.00 | 0.00 | 11/09/2019 | 12/07/2020 | | 37.34 |
| 05101 | 4810-c1 | 1,376.00 00067468 | Diana Cantu | 1,750.00 | 1,606.00 | 0.00 | 0.00 | 08/31/2018 | 08/31/2020 | | 0.01 |
| 05102 | 4810-a1 | 757.00 00091651 | Jodi Moore | 1,165.00 | 995.00 | 400.00 | 0.00 | 08/03/2019 | 08/03/2020 | | 0.00 |
| 05103 | 4810-b3 | 1,299.00 0102474 | Moses Casas | 1,575.00 | 1,475.00 | 0.00 | 0.00 | 11/22/2019 | 12/21/2020 | | 35.00 |
| 05105 | 4810-b1 | 1,024.00 0083505 | Francis Lyons | 1,475.00 | 1,475.00 | 0.00 | 0.00 | 07/17/2019 | 07/20/2020 | | 0.08 |
| 05108 | 4810-a3 | 769.00 00081548 | Laura Vincent | 1,070.00 | 1,070.00 | 0.00 | 0.00 | 05/25/2019 | 05/31/2020 | | 0.08 |
| 05110 | 4810-a3 | 769.00 0101527 | Benjamin Dysart | 1,070.00 | 999.00 | 0.00 | 0.00 | 11/15/2019 | 12/14/2020 | | 0.00 |
| 05113 | 4810-b1 | 1,024.00 00078630 | Donnie Alvina | 1,475.00 | 1,399.00 | 0.00 | 0.00 | 03/13/2019 | 03/16/2020 | | 34.8 |
| 05204 | 4810-b4 | 1,389.00 00085673 | Neil Langgaard | 1,650.00 | 1,650.00 | 400.00 | 0.00 | 07/11/2019 | 07/13/2020 | | 0.00 |
| 05206 | 4810-a4 | 1,084.00 00070163 | John Wakabi | 1,500.00 | 1,350.00 | 0.00 | 0.00 | 11/06/2018 | 05/11/2020 | | 0.06 |
| 05207 | 4810-a4 | 954.00 0353991 | Angelica Mora | 1,260.00 | 1,260.00 | 0.00 | 0.00 | 07/27/2019 | 07/31/2020 | | 0.00 |
| 05209 | 4810-a2 | 859.00 0077989 | Katherine Serna | 1,245.00 | 1,085.00 | 0.00 | 0.00 | 03/25/2019 | 03/30/2020 | | 0.09 |
| 05211 | 4810-a4 | 954.00 0043346 | Joey Cross | 1,260.00 | 1,099.00 | 0.00 | 0.00 | 09/01/2017 | 02/24/2020 | | 0.00 |
| 05212 | 4810-b2 | 1,084.00 0086959 | Vanessa Zermeno | 1,500.00 | 1,250.00 | 0.00 | 0.00 | 07/12/2019 | 07/13/2020 | | -1,381.66 |
| 05214 | 4810-c2 | 1,477.00 0069085 | Johnny Maldonado Jr | 1,799.00 | 1,699.00 | 0.00 | 0.00 | 10/31/2018 | 11/30/2020 | | 0.00 |
| 06101 | 4810-c1g | 1,376.00 0095426 | Tina Turcios | 1,850.00 | 1,705.00 | 0.00 | 0.00 | 07/09/2019 | 09/07/2020 | | -1,885.15 |
| 06102 | 4810-a1g | 757.00 0430251 | Samantha Amaro | 1,265.00 | 930.00 | 0.00 | 0.00 | 11/23/2018 | 12/07/2020 | | 0.00 |
| 06103 | 4810-b3g | 1,299.00 0082865 | Jorge Caldera | 1,625.00 | 1,625.00 | 0.00 | 0.00 | 05/31/2019 | 06/01/2020 | | 0.05 |
| 06204 | 4810-b4g | 1,389.00 0258109 | Kaylen Jones | 1,750.00 | 1,650.00 | 0.00 | 0.00 | 10/10/2018 | 12/07/2020 | | -92.57 |
| 06206 | 4810-b4g | 1,084.00 0449040 | James Henderson | 1,550.00 | 1,450.00 | 0.00 | 0.00 | 12/08/2018 | 01/13/2020 | | -1,546.36 |
| 06207 | 4810-a4g | 954.00 0433883 | Kacia Hall | 1,325.00 | 1,149.00 | 0.00 | 0.00 | 10/19/2018 | 05/04/2020 | | 0.00 |
| 06209 | 4810-a2g | 859.00 0434056 | Adrian Ortiz | 1,445.00 | 1,200.00 | 0.00 | 0.00 | 12/13/2019 | 11/30/2020 | | 506.60 |
| 06211 | 4810-a4g | 954.00 0437538 | Tom Gills | 1,325.00 | 1,199.00 | 0.00 | 0.00 | 11/30/2018 | 01/06/2020 | 01/06/2020 | -292.18 |
| 06212 | 4810-b2g | 1,084.00 0098183 | Careiton Burkett | 1,550.00 | 1,300.00 | 0.00 | 0.00 | 06/29/2020 | 06/29/2020 | | -1,507.55 |
| 06214 | 4810-c2g | 1,477.00 0373909 | Yanica Mumphery | 1,899.00 | 1,835.00 | 0.00 | 0.00 | 07/09/2018 | 09/14/2020 | | -1,896.17 |
| 07101 | 4810-c1g | 1,376.00 0411937 | John Flores | 1,850.00 | 1,850.00 | 0.00 | 0.00 | 08/31/2018 | 11/04/2019 | | 0.00 |
| 07102 | 4810-b3g | 1,299.00 0086918 | Javier Gonzalez | 1,850.00 | 1,079.00 | 0.00 | 0.00 | 07/31/2019 | 07/27/2020 | | 0.05 |
| 07103 | 4810-b3g | 1,299.00 0102086 | Doris Smith | 1,625.00 | 1,499.00 | 0.00 | 0.00 | 12/15/2019 | 01/31/2021 | | -696.97 |
| 07204 | 4810-a1g | 1,389.00 VACANT | VACANT | 1,750.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 07206 | 4810-b2g | 1,084.00 0052057 | Eric Saunders Malave | 1,550.00 | 1,390.26 | 0.00 | 0.00 | 02/03/2018 | 03/02/2020 | | 0.00 |

Page 3

# Rent Roll

Echelon at Monterey Village (4810)
As Of = 12/31/2020

Month Year = 12/2019

| Unit | Unit Type | Unit Sq Ft | Resident | Name | Market Rent | Actual Rent | Resident Deposit | Other Deposit | Move In | Lease Expiration | Move Out | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07207 | 4810-a4g | 954.00 | 01103046 | Mohammed ALSHAHRANI | 1,325.00 | 1,199.00 | 0.00 | 0.00 | 11/30/2019 | 12/31/2020 | | 0.00 |
| 07209 | 4810-a3g | 859.00 | 00089515 | Hui Chung Lu | 1,445.00 | 1,200.00 | 0.00 | 0.00 | 07/20/2019 | 02/17/2020 | | 0.00 |
| 07211 | 4810-a4g | 954.00 | 00049591 | Gilberto Castillo | 1,325.00 | 1,199.00 | 0.00 | 0.00 | 12/07/2019 | 11/30/2020 | | 270.75 |
| 07212 | 4810-b3g | 1,084.00 | 00086150 | Allahyante Chavis | 1,550.00 | 1,550.00 | 0.00 | 0.00 | 08/10/2020 | 08/10/2020 | | -2,167.99 |
| 07214 | 4810-c2g | 1,477.00 | 00066645 | Rodolfo Guevara | 1,899.00 | 1,799.00 | 0.00 | 0.00 | 08/18/2018 | 07/27/2020 | | 0.00 |
| 08101 | 4810-c1g | 1,376.00 | VACANT | VACANT | 1,850.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 08102 | 4810-a1g | 757.00 | 00409294 | Chad VanMeter | 1,265.00 | 1,225.00 | 0.00 | 0.00 | 07/28/2018 | 10/12/2020 | | -1,284.00 |
| 08103 | 4810-b3g | 1,299.00 | VACANT | VACANT | 1,625.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 08204 | 4810-b4g | 1,389.00 | 03391482 | Brittany Midkiff | 1,750.00 | 1,615.00 | 0.00 | 0.00 | 08/04/2018 | 10/05/2020 | | 0.00 |
| 08206 | 4810-b2g | 1,084.00 | 00085417 | Bryona Estrada | 1,550.00 | 1,550.00 | 0.00 | 0.00 | 07/01/2019 | 07/06/2020 | | -74.95 |
| 08207 | 4810-a4g | 954.00 | 00063923 | Lexus Murray | 1,325.00 | 1,325.00 | 0.00 | 0.00 | 09/06/2019 | 10/12/2020 | | -2,414.64 |
| 08209 | 4810-a3g | 859.00 | 00086366 | Sydney Leach | 1,445.00 | 1,049.00 | 0.00 | 0.00 | 08/16/2019 | 08/17/2020 | | 0.00 |
| 08211 | 4810-a4g | 954.00 | 00084357 | Brandi Wall | 1,325.00 | 1,325.00 | 0.00 | 0.00 | 07/13/2019 | 07/13/2020 | | 0.00 |
| 08212 | 4810-b2g | 1,084.00 | 00086274 | Ubal Andaya Duarte | 1,550.00 | 1,300.00 | 0.00 | 0.00 | 06/28/2019 | 06/29/2020 | | 50.00 |
| 08214 | 4810-c2g | 1,477.00 | 00435246 | Hector Rodriguez | 1,899.00 | 1,899.00 | 0.00 | 0.00 | 09/13/2019 | 09/14/2020 | | -2,061.53 |
| 09101 | 4810-c1 | 1,376.00 | 00093613 | Gilbert Garza | 1,750.00 | 1,650.00 | 0.00 | 0.00 | 08/16/2019 | 08/31/2020 | | -160.00 |
| 09102 | 4810-a1 | 757.00 | VACANT | VACANT | 1,165.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 09103 | 4810-b3 | 1,299.00 | 00077470 | Alexandra Layman | 1,575.00 | 1,575.00 | 0.00 | 0.00 | 03/31/2019 | 04/06/2020 | | 0.00 |
| 09105 | 4810-b1 | 1,024.00 | 00094723 | Addison Starr | 1,475.00 | 1,200.00 | 0.00 | 0.00 | 09/18/2019 | 09/21/2020 | | 0.00 |
| 09108 | 4810-a3 | 769.00 | 00085725 | Arieen Lopez | 1,070.00 | 1,070.00 | 0.00 | 0.00 | 07/19/2019 | 07/20/2020 | | -1,940.87 |
| 09110 | 4810-a3 | 769.00 | 00097463 | CHARLOTTE MAHER | 1,070.00 | 999.00 | 0.00 | 0.00 | 11/16/2019 | 11/30/2020 | | -75.00 |
| 09113 | 4810-b1 | 1,024.00 | 00372694 | David Clark | 1,475.00 | 1,249.00 | 0.00 | 0.00 | 05/10/2018 | 05/18/2020 | | -309.63 |
| 09204 | 4810-b4 | 1,389.00 | 00095840 | Quentin Foster | 1,650.00 | 1,525.00 | 0.00 | 0.00 | 09/24/2019 | 09/21/2020 | | -1,620.93 |
| 09206 | 4810-b2 | 1,084.00 | 00093644 | ahmed aldossary | 1,500.00 | 1,250.00 | 0.00 | 0.00 | 08/16/2019 | 08/17/2020 | | -197.36 |
| 09208 | 4810-a4 | 954.00 | VACANT | VACANT | 1,260.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 09209 | 4810-a2 | 859.00 | VACANT | VACANT | 1,245.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 09211 | 4810-a4 | 954.00 | 00096794 | Mariah Avery-Williams | 1,260.00 | 1,099.00 | 0.00 | 0.00 | 10/14/2019 | 10/12/2020 | | 0.00 |
| 09212 | 4810-b2 | 1,084.00 | 00324338 | Kathleen Alland | 1,500.00 | 1,199.00 | 0.00 | 0.00 | 06/02/2018 | 06/08/2020 | | 0.00 |
| 09214 | 4810-c2 | 1,477.00 | VACANT | VACANT | 1,799.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 10101 | 4810-c1g | 1,376.00 | VACANT | VACANT | 1,850.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 10102 | 4810-a3g | 757.00 | 00094511 | Malik West | 1,265.00 | 1,200.00 | 400.00 | 0.00 | 09/16/2019 | 09/14/2020 | | -121.56 |
| 10103 | 4810-b3g | 1,299.00 | 00088666 | Francisco Olivares | 1,625.00 | 1,625.00 | 0.00 | 0.00 | 07/13/2019 | 07/13/2020 | | 0.00 |
| 10204 | 4810-b4g | 1,389.00 | VACANT | VACANT | 1,750.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 10206 | 4810-b2g | 1,084.00 | 00079582 | Karis Bowman | 1,550.00 | 1,550.00 | 0.00 | 0.00 | 04/10/2019 | 01/13/2020 | | -1,618.60 |
| 10207 | 4810-b4g | 954.00 | 00097848 | Gersam Morales | 1,325.00 | 1,200.00 | 0.00 | 0.00 | 12/06/2019 | 12/07/2020 | | 0.00 |
| 10209 | 4810-b3g | 859.00 | 00087748 | sultan alashry | 1,445.00 | 1,200.00 | 0.00 | 0.00 | 07/18/2019 | 02/24/2020 | 01/04/2020 | 317.88 |
| 10211 | 4810-a4g | 954.00 | 00077343 | Bethany Ramos | 1,325.00 | 1,199.00 | 0.00 | 0.00 | 04/01/2019 | 04/06/2020 | | 0.00 |
| 10212 | 4810-c1g | 1,084.00 | VACANT | VACANT | 1,550.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 10214 | 4810-c2g | 1,477.00 | 00054109 | Antoniette Suer | 1,899.00 | 1,741.15 | 0.00 | 0.00 | 05/01/2018 | 06/08/2020 | | 0.00 |

Tuesday, December 31, 2019
11:45 AM

# Rent Roll

Echelon at Monterey Village (4810)
As Of = 12/31/2020
Month Year = 12/2019

| Unit | Unit Type | Unit Sq Ft | Resident | Name | Market Rent | Actual Rent | Resident Deposit | Other Deposit | Move In | Lease Expiration | Move Out | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11101 | 4810-c1g | 1,376.00 | 0400961 | Viridiana Barrera | 1,850.00 | 1,699.00 | 0.00 | 0.00 | 08/31/2018 | 11/09/2020 | | 0.00 |
| 11102 | 4810-a1g | 757.00 | 0438396 | Jenna Perez | 1,265.00 | 930.00 | 0.00 | 0.00 | 11/30/2018 | 12/07/2020 | | -1,001.33 |
| 11103 | 4810-b3g | 1,299.00 | 0100526 | Perla Amos | 1,625.00 | 1,499.00 | 0.00 | 0.00 | 11/06/2019 | 12/07/2020 | | 0.0 |
| 11204 | 4810-b4g | 1,389.00 | VACANT | VACANT | 1,750.00 | 0.00 | | 0.00 | | | | 0.0 |
| 11206 | 4810-b2g | 1,084.00 | 0084822 | Adrienne Kennedy | 1,550.00 | 1,550.00 | 0.00 | 0.00 | 06/20/2019 | 04/20/2020 | | -3,606.99 |
| 11207 | 4810-a4g | 954.00 | 0086734 | Michael Contreras | 1,325.00 | 1,325.00 | 0.00 | 0.00 | 08/16/2019 | 08/31/2020 | | 0.0 |
| 11209 | 4810-a2g | 859.00 | 0441451 | Earnest Amuyinegbe | 1,445.00 | 999.00 | 0.00 | 0.00 | 10/29/2018 | 05/04/2020 | | -1,061.41 |
| 11211 | 4810-a4g | 954.00 | 0071084 | April Ledesma | 1,325.00 | 1,199.00 | 0.00 | 0.00 | 12/17/2018 | 01/06/2020 | 01/06/2020 | -288.44 |
| 11212 | 4810-b2g | 1,084.00 | 0102908 | Sara Hendrix | 1,550.00 | 1,499.00 | 0.00 | 0.00 | 12/06/2019 | 12/28/2020 | | -776.17 |
| 11214 | 4810-c2g | 1,477.00 | VACANT | VACANT | 1,899.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 12101 | 4810-c1 | 1,376.00 | VACANT | VACANT | 1,750.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 12102 | 4810-a1 | 757.00 | 0083269 | Just Like Home | 1,165.00 | 1,165.00 | 0.00 | 0.00 | 05/15/2019 | 05/18/2020 | | 0.00 |
| 12103 | 4810-b3 | 1,299.00 | 0097305 | khalid khomri | 1,575.00 | 1,475.00 | 0.00 | 0.00 | 10/05/2019 | 10/05/2020 | | -1,547.51 |
| 12105 | 4810-b1 | 1,024.00 | 0352057 | John Morgan | 1,475.00 | 1,325.00 | 0.00 | 0.00 | 03/22/2018 | 03/23/2020 | | 0.08 |
| 12108 | 4810-a3 | 769.00 | 0086485 | Catherine Herrera | 1,070.00 | 1,070.00 | 0.00 | 0.00 | 09/06/2019 | 08/31/2020 | | 0.08 |
| 12110 | 4810-a3 | 769.00 | 0067708 | Giselle Gallegos | 1,070.00 | 1,090.00 | 0.00 | 0.00 | 11/17/2018 | 01/27/2020 | 02/01/2020 | -1,034.82 |
| 12113 | 4810-b1 | 1,024.00 | 0094655 | Angie Flores | 1,475.00 | 1,300.00 | 0.00 | 0.00 | 09/06/2019 | 09/07/2020 | 01/27/2020 | 0.0 |
| 12204 | 4810-b4 | 1,389.00 | 0071733 | David Harvey | 1,650.00 | 1,550.00 | 400.00 | 0.00 | 01/26/2019 | 02/03/2020 | | -20.00 |
| 12206 | 4810-b2 | 1,084.00 | 0371606 | Rhonda Lyons | 1,500.00 | 1,325.00 | 0.00 | 0.00 | 05/14/2018 | 05/25/2020 | | 0.0 |
| 12207 | 4810-a4 | 954.00 | 0307353 | Robert Chambers | 1,260.00 | 999.00 | 0.00 | 0.00 | 03/02/2018 | 06/01/2020 | 01/31/2020 | 1,261.61 |
| 12209 | 4810-a2 | 859.00 | 0088601 | Elizabeth LejK | 1,245.00 | 1,096.00 | 400.00 | 0.00 | 07/25/2019 | 07/31/2020 | | 0.0 |
| 12211 | 4810-a4 | 954.00 | VACANT | VACANT | 1,260.00 | 0.00 | 0.00 | 0.00 | | | | 0.0 |
| 12213 | 4810-b2 | 1,084.00 | 0096702 | Joslyn Reed | 1,500.00 | 1,200.00 | 0.00 | 0.00 | 11/09/2019 | 10/31/2020 | | -1,338.88 |
| 12214 | 4810-c2 | 1,477.00 | VACANT | VACANT | 1,799.00 | 0.00 | 0.00 | 0.00 | | | | 0.0 |
| 13101 | 4810-c1g | 1,376.00 | 0074242 | Marife Cayas | 1,850.00 | 1,850.00 | 0.00 | 0.00 | 02/10/2019 | 01/27/2020 | 02/08/2020 | 0.0 |
| 13102 | 4810-a1g | 757.00 | 0044760 | Jaxon Abdoo | 1,265.00 | 1,250.00 | 0.00 | 0.00 | 08/24/2018 | 09/07/2020 | | 0.03 |
| 13103 | 4810-b3g | 1,299.00 | 0368328 | Laryn Nelson | 1,625.00 | 1,555.00 | 0.00 | 0.00 | 05/09/2018 | 07/06/2020 | | 0.00 |
| 13204 | 4810-b4g | 1,389.00 | 0052130 | Quincy Williams | 1,750.00 | 1,615.00 | 0.00 | 0.00 | 07/31/2018 | 07/27/2020 | | 0.0 |
| 13206 | 4810-b2g | 1,084.00 | 0103092 | Selina Banda | 1,550.00 | 1,499.00 | 0.00 | 0.00 | 12/02/2019 | 12/31/2020 | | -83.35 |
| 13207 | 4810-a4g | 954.00 | 0084094 | Wataru Miyoshi | 1,325.00 | 1,325.00 | 0.00 | 0.00 | 06/12/2019 | 06/15/2020 | | 0.0 |
| 13209 | 4810-a2g | 859.00 | 0070131 | Aaron Blue | 1,445.00 | 999.00 | 0.00 | 0.00 | 11/24/2018 | 11/30/2020 | | 0.0 |
| 13211 | 4810-a4g | 954.00 | 0433717 | Akintunde Erophillips | 1,325.00 | 1,099.00 | 0.00 | 0.00 | 10/04/2018 | 02/03/2020 | | 0.03 |
| 13212 | 4810-b2g | 1,084.00 | 0044215 | Eloy Arechiga | 1,550.00 | 1,450.00 | 0.00 | 0.00 | 03/23/2018 | 03/30/2020 | | 0.07 |
| 13214 | 4810-c2g | 1,477.00 | VACANT | VACANT | 1,899.00 | 0.00 | 0.00 | 0.00 | | | | 0.07 |
| 14101 | 4810-c1g | 1,376.00 | 0056686 | Laveshia Williams | 1,850.00 | 1,735.00 | 0.00 | 0.00 | 05/01/2018 | 07/06/2020 | | 0.0 |
| 14102 | 4810-a1g | 757.00 | 0436269 | Jeffery Massey | 1,265.00 | 920.00 | 0.00 | 0.00 | 12/16/2018 | 01/27/2020 | 01/27/2020 | 0.03 |
| 14103 | 4810-b3g | 1,299.00 | 0045751 | Alec Pena | 1,625.00 | 1,581.00 | 0.00 | 0.00 | 09/22/2018 | 09/30/2020 | | 0.00 |
| 14204 | 4810-b4g | 1,389.00 | 0070470 | Zena Garcia | 1,750.00 | 1,750.00 | 0.00 | 0.00 | 05/01/2019 | 05/04/2020 | | 0.00 |
| 14206 | 4810-b2g | 1,084.00 | 0047684 | Sadday Hernandez | 1,550.00 | 1,450.15 | 0.00 | 0.00 | 01/13/2018 | 02/24/2020 | | -88.15 |

# Rent Roll

Echelon at Monterey Village (4810)
As Of = 12/31/2020
Month Year = 12/2019

| Unit | Unit Type | Unit Sq Ft | Resident | Name | Market Rent | Actual Rent | Resident Deposit | Other Deposit | Move In | Lease Expiration | Move Out | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14207 | 4810-a4g | 954.00 | VACANT | VACANT | 1,325.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 14209 | 4810-a3g | 859.00 | 0040489 | Teresa Gostman | 1,445.00 | 1,049.00 | 0.00 | 0.00 | 11/01/2018 | 01/27/2018 | | -50.00 |
| 14211 | 4810-a4g | 954.00 | 0083195 | Kelsey Fort | 1,325.00 | 1,325.00 | 0.00 | 0.00 | 05/17/2019 | 05/18/2020 | | -489.81 |
| 14212 | 4810-b3g | 1,084.00 | 0054818 | Francheska plass Rodriguez | 1,550.00 | 1,435.50 | 0.00 | 0.00 | 03/15/2018 | 03/30/2020 | | 0.00 |
| 14214 | 4810-c2g | 1,477.00 | 0093466 | Amer Alshehri | 1,899.00 | 1,899.00 | 0.00 | 0.00 | 08/15/2019 | 05/25/2020 | | 0.00 |
| 15101 | 4810-c1 | 1,376.00 | VACANT | VACANT | 1,750.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 15102 | 4810-a1 | 757.00 | 0095507 | Myeshia Bradley | 1,165.00 | 975.00 | 0.00 | 0.00 | 10/05/2019 | 10/05/2020 | | -1,051.95 |
| 15103 | 4810-b3 | 1,299.00 | 0086735 | Wendy Hinojosa | 1,575.00 | 1,575.00 | 400.00 | 0.00 | 07/02/2019 | 07/06/2020 | | -1,533.50 |
| 15105 | 4810-b1 | 1,024.00 | 0321707 | Shalanna Paliesen | 1,475.00 | 1,399.00 | 0.00 | 0.00 | 03/14/2019 | 03/16/2020 | | -1,502.61 |
| 15108 | 4810-a3 | 769.00 | 0074135 | David Claar | 1,070.00 | 1,070.00 | 0.00 | 0.00 | 03/30/2019 | 03/30/2020 | | 0.00 |
| 15110 | 4810-a3 | 769.00 | VACANT | VACANT | 1,070.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 15113 | 4810-b1 | 1,024.00 | VACANT | VACANT | 1,475.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 15204 | 4810-b4 | 1,389.00 | 0050354 | Spencer Mason | 1,650.00 | 1,649.00 | 0.00 | 0.00 | 12/14/2017 | 12/16/2019 | 02/15/2020 | 0.00 |
| 15206 | 4810-b2 | 1,084.00 | 0098813 | Ahmad Al-Mulla | 1,500.00 | 1,500.00 | 0.00 | 0.00 | 07/18/2019 | 02/17/2020 | 01/10/2020 | -36.11 |
| 15207 | 4810-a4 | 954.00 | 0311444 | Kyle Hubert | 1,260.00 | 969.03 | 0.00 | 0.00 | 03/12/2018 | 01/20/2020 | | 0.00 |
| 15209 | 4810-a2 | 859.00 | 0049443 | Kyra Farmer | 1,245.00 | 1,096.00 | 0.00 | 0.00 | 11/09/2019 | 10/31/2020 | | 0.00 |
| 15210 | 4810-a4 | 954.00 | 0288521 | Monica Gonzalez | 1,280.00 | 1,099.00 | 0.00 | 0.00 | 03/11/2019 | 03/16/2020 | | 0.00 |
| 15212 | 4810-b2 | 1,084.00 | 0044978 | Catarino Gomez | 1,500.00 | 1,200.00 | 0.00 | 0.00 | 10/01/2019 | 09/30/2020 | | 0.00 |
| 15214 | 4810-c2 | 1,477.00 | 0093625 | Mohammed AL AKLABI | 1,799.00 | 1,799.00 | 0.00 | 0.00 | 08/16/2019 | 05/25/2020 | | 0.00 |
| 16101 | 4810-c1 | 1,376.00 | VACANT | VACANT | 1,750.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 16102 | 4810-a1 | 757.00 | 0095550 | Marissa Botello | 1,165.00 | 975.00 | 0.00 | 0.00 | 09/13/2019 | 09/14/2020 | | 0.00 |
| 16103 | 4810-b3 | 1,299.00 | 0418651 | Courtney Simms | 1,575.00 | 1,500.00 | 0.00 | 0.00 | 10/01/2018 | 10/26/2020 | | 0.00 |
| 16106 | 4810-b1 | 1,024.00 | 0075295 | Anton Channel | 1,475.00 | 1,399.00 | 0.00 | 0.00 | 02/15/2019 | 02/24/2020 | 02/24/2020 | 0.00 |
| 16108 | 4810-a3 | 769.00 | 0073000 | Darek Peterson | 1,070.00 | 1,070.00 | 0.00 | 0.00 | 03/12/2019 | 03/16/2020 | | 50.00 |
| 16110 | 4810-a3 | 769.00 | 0437126 | Raymond Arredondo | 1,070.00 | 1,070.00 | 0.00 | 0.00 | 11/17/2018 | 12/02/2020 | | 50.00 |
| 16113 | 4810-b1 | 1,024.00 | 0094645 | Latisha Cole | 1,475.00 | 1,300.00 | 0.00 | 0.00 | 09/11/2019 | 09/14/2020 | | 0.00 |
| 16204 | 4810-b4 | 1,389.00 | 0093117 | bakheet alhajri | 1,650.00 | 1,650.00 | 0.00 | 0.00 | 08/09/2019 | 04/30/2020 | | 0.00 |
| 16206 | 4810-b2 | 1,084.00 | 0097492 | Jessica Tuff-Harvey | 1,500.00 | 1,200.00 | 400.00 | 0.00 | 10/11/2019 | 10/05/2020 | | 0.00 |
| 16207 | 4810-a4 | 954.00 | 0077576 | Devin Ramirez | 1,260.00 | 1,099.00 | 0.00 | 0.00 | 03/10/2019 | 02/29/2020 | | 0.00 |
| 16209 | 4810-a2 | 859.00 | VACANT | VACANT | 1,245.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 16211 | 4810-a4 | 954.00 | 0096069 | Mazen Alsulami | 1,260.00 | 1,099.00 | 0.00 | 0.00 | 10/02/2019 | 03/30/2020 | | -1,155.94 |
| 16212 | 4810-b2 | 1,084.00 | 0070639 | Oluwaseun Owoola | 1,500.00 | 1,390.00 | 0.00 | 0.00 | 12/22/2018 | 01/20/2020 | | -1,436.93 |
| 16214 | 4810-c2 | 1,477.00 | 0095036 | Marwan Aljahdali | 1,799.00 | 1,799.00 | 0.00 | 0.00 | 06/05/2019 | 03/09/2020 | | 0.00 |
| 17101 | 4810-c1 | 1,376.00 | 0095329 | Christopher Gerhart | 1,750.00 | 1,599.00 | 400.00 | 0.00 | 09/09/2019 | 09/07/2020 | | 0.00 |
| 17102 | 4810-a1 | 757.00 | 0095472 | Phoenix Ostwald | 1,165.00 | 975.00 | 400.00 | 0.00 | 09/11/2019 | 09/07/2020 | | 0.00 |
| 17103 | 4810-c3 | 1,299.00 | VACANT | VACANT | 1,575.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 17105 | 4810-b1 | 1,024.00 | 0105253 | Corderro Saunders | 1,475.00 | 1,299.00 | 0.00 | 0.00 | 12/27/2019 | 01/26/2021 | | -1,739.61 |
| 17108 | 4810-a3 | 769.00 | 0444110 | Kimberly Olivo | 1,070.00 | 1,070.00 | 0.00 | 0.00 | 12/20/2018 | 12/30/2019 | | 125.00 |
| 17110 | 4810-a3 | 769.00 | VACANT | VACANT | 1,070.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |

# Rent Roll

Echelon at Monterrey Village (4810)

As Of = 12/31/2020

Month Year = 12/2019

| Unit | Unit Type | Unit Sq Ft | Resident | Name | Market Rent | Actual Rent | Resident Deposit | Other Deposit | Move In | Lease Expiration | Move Out | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17113 | 4810-b1 | 1,024.00 | 00154041 | Isaac Gabe Hale | 1,475.00 | 1,351.00 | 0.00 | 0.00 | 03/03/2018 | 03/04/2020 | | 0.00 |
| 17204 | 4810-b4 | 1,389.00 | VACANT | | 1,650.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 17206 | 4810-b2 | 1,084.00 | 00151547 | Yaneth Paiz | 1,500.00 | 1,379.00 | 0.00 | 0.00 | 02/01/2018 | 04/13/2020 | | 0.0% |
| 17207 | 4810-a4 | 954.00 | 00094711 | Cristobal Altamirano | 1,260.00 | 1,165.00 | 400.00 | 0.00 | 08/31/2018 | 05/31/2020 | | 0.00 |
| 17209 | 4810-a2 | 859.00 | 03/67368 | Tyasia Priester | 1,245.00 | 1,186.00 | 0.00 | 0.00 | 05/03/2018 | 06/08/2020 | | -1,246.2 |
| 17211 | 4810-a4 | 954.00 | 00078027 | Nicholas Morales | 1,260.00 | 1,099.00 | 0.00 | 0.00 | 04/05/2019 | 03/30/2020 | | 0.00 |
| 17212 | 4810-b2 | 1,084.00 | 00087324 | Natasha Finklea | 1,500.00 | 1,250.00 | 0.00 | 0.00 | 07/01/2019 | 07/06/2020 | | 0.00 |
| 17214 | 4810-c2 | 1,477.00 | VACANT | | 1,799.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 18101 | 4810-c1 | 1,376.00 | 00056584 | Just Like Home | 1,750.00 | 1,614.00 | 0.00 | 0.00 | 04/30/2018 | 06/08/2020 | | 0.00 |
| 18102 | 4810-a1 | 757.00 | 00094704 | Robert Quintero | 1,165.00 | 1,071.00 | 0.00 | 0.00 | 08/01/2018 | 03/30/2020 | | 0.09 |
| 18103 | 4810-b3 | 1,299.00 | VACANT | | 1,575.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 18105 | 4810-b1 | 1,024.00 | 00095574 | Lanae Garcia | 1,475.00 | 1,200.00 | 0.00 | 0.00 | 10/03/2019 | 09/28/2020 | | 0.0% |
| 18108 | 4810-a3 | 769.00 | 00043211 | Alejandro Donner | 1,070.00 | 979.00 | 0.00 | 0.00 | 07/06/2018 | 07/06/2020 | | 0.00 |
| 18110 | 4810-a3 | 769.00 | 00097862 | oscar rosales | 1,070.00 | 999.00 | 0.00 | 0.00 | 10/19/2019 | 07/20/2020 | | 0.03 |
| 18113 | 4810-b1 | 1,024.00 | 03/66866 | Andy Overgard | 1,475.00 | 1,475.00 | 0.00 | 0.00 | 05/05/2018 | 12/16/2019 | | 0.03 |
| 18204 | 4810-b4 | 1,389.00 | VACANT | | 1,650.00 | 0.00 | 0.00 | 0.00 | | | | 0.03 |
| 18206 | 4810-b2 | 1,084.00 | 00087117 | Tiara Davis | 1,500.00 | 1,200.00 | 400.00 | 0.00 | 10/03/2019 | 11/02/2020 | | -1,262.9 |
| 18207 | 4810-a4 | 954.00 | 01/02314 | Morgan Charles | 1,260.00 | 1,099.00 | 0.00 | 0.00 | 11/23/2019 | 12/21/2020 | | -1,154.6: |
| 18209 | 4810-a2 | 859.00 | 00077946 | Nicole Gennawey | 1,245.00 | 1,085.00 | 0.00 | 0.00 | 04/03/2019 | 04/06/2020 | | 0.00 |
| 18211 | 4810-a4 | 954.00 | 00079337 | Marcus Wimbush | 1,260.00 | 1,260.00 | 0.00 | 0.00 | 05/06/2019 | 04/30/2020 | | 0.0% |
| 18212 | 4810-b2 | 1,084.00 | 00096775 | Jazzmin Cervera | 1,500.00 | 1,200.00 | 0.00 | 0.00 | 09/28/2020 | 09/28/2020 | | 0.09 |
| 18214 | 4810-c2 | 1,477.00 | VACANT | | 1,799.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 19101 | 4810-c1g | 1,376.00 | 00067699 | Joey Hurley | 1,850.00 | 1,709.00 | 0.00 | 0.00 | 10/31/2018 | 12/28/2020 | | -100.00 |
| 19102 | 4810-a1g | 757.00 | 00083491 | Aaron Villarreal | 1,265.00 | 1,265.00 | 0.00 | 0.00 | 06/24/2019 | 06/29/2020 | | -794.63 |
| 19103 | 4810-b3g | 1,299.00 | 00097740 | Myra Hunter | 1,625.00 | 1,499.00 | 0.00 | 0.00 | 10/11/2019 | 10/12/2020 | | -2,207.15 |
| 19204 | 4810-b4g | 1,389.00 | 00060016 | Julio Guajardo | 1,750.00 | 1,635.00 | 0.00 | 0.00 | 05/31/2018 | 07/27/2020 | | 0.00 |
| 19206 | 4810-b2g | 1,084.00 | VACANT | | 1,550.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 19207 | 4810-a4g | 954.00 | 01/03189 | Jasmine Valdez | 1,325.00 | 1,199.00 | 0.00 | 0.00 | 12/20/2019 | 01/31/2021 | | -1,112.5 |
| 19209 | 4810-a2g | 859.00 | VACANT | | 1,445.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 19211 | 4810-a4g | 954.00 | 03/18496 | Marlon Hudson | 1,325.00 | 1,173.00 | 0.00 | 0.00 | 03/31/2018 | 03/30/2020 | | 0.00 |
| 19212 | 4810-b2g | 1,084.00 | 01/02172 | Joniece Dorsey | 1,550.00 | 1,499.00 | 0.00 | 0.00 | 11/15/2019 | 12/14/2020 | | -2,621.65: |
| 19214 | 4810-c2g | 1,477.00 | 00069553 | Annette Gomez | 1,899.00 | 1,760.00 | 0.00 | 0.00 | 09/26/2018 | 03/30/2020 | | 0.07 |
| 20101 | 4810-c1 | 1,376.00 | 00080478 | Alfredo Mendez | 1,750.00 | 1,750.00 | 0.00 | 0.00 | 04/12/2019 | 04/06/2020 | | 0.00 |
| 20102 | 4810-a1 | 757.00 | 04/25548 | Nicole Pompel | 1,165.00 | 1,075.00 | 0.00 | 0.00 | 09/07/2018 | 10/05/2020 | | 0.03 |
| 20103 | 4810-b3 | 1,299.00 | VACANT | | 1,575.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 20105 | 4810-b1 | 1,024.00 | 03/76188 | Juanica Page | 1,475.00 | 1,249.00 | 0.00 | 0.00 | 06/16/2018 | 08/24/2020 | | 0.003 |
| 20108 | 4810-a3 | 769.00 | 00089792 | Eric Agosto | 1,070.00 | 1,070.00 | 400.00 | 0.00 | 08/30/2019 | 08/31/2020 | | -3.38 |
| 20110 | 4810-a3 | 769.00 | VACANT | | 1,070.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 20113 | 4810-b1 | 1,024.00 | 00094546 | Jennifer Banda | 1,475.00 | 1,300.00 | 0.00 | 0.00 | 09/20/2019 | 09/28/2020 | | 0.00 |

Tuesday, December 31, 2019
11:45 AM

# Rent Roll

Echelon at Monterrey Village (4810)
As Of = 12/31/2020
Month Year = 12/2019

| Unit | Unit Type | Unit Resident Sq Ft | Name | Market Rent | Actual Rent | Resident Deposit | Other Deposit | Move In | Lease Expiration | Move Out | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 20204 | 4810-b4 | 1,389.00 | 00097877 | Enver Topsakal | 1,650.00 | 1,525.00 | 0.00 | 0.00 | 10/18/2019 | 07/31/2020 | | 0.00 |
| 20206 | 4810-b2 | 1,084.00 | 00057470 | Martin Garza | 1,500.00 | 1,199.00 | 0.00 | 0.00 | 04/20/2018 | 06/29/2020 | | -84.58 |
| 20207 | 4810-a4 | 954.00 | 00070130 | Raymond Marin | 1,260.00 | 1,010.00 | 0.00 | 0.00 | 10/31/2018 | 07/27/2020 | | 0.00 |
| 20209 | 4810-a2 | 859.00 | 00093371 | Rashid Al-Naimi | 1,245.00 | 1,146.00 | 400.00 | 0.00 | 08/13/2019 | 02/17/2020 | | 0.00 |
| 20211 | 4810-a4 | 954.00 | 00077032 | Daniel Shue | 1,260.00 | 1,099.00 | 0.00 | 0.00 | 04/19/2019 | 04/20/2020 | | 0.00 |
| 20212 | 4810-b2 | 1,084.00 | 00093618 | Delio Dominguez | 1,500.00 | 1,250.00 | 0.00 | 0.00 | 08/23/2019 | 08/24/2020 | | 0.00 |
| 20214 | 4810-c2 | 1,477.00 | 00088378 | Faisal H A Al-Naimi | 1,799.00 | 1,799.00 | 0.00 | 0.00 | 07/11/2019 | 02/10/2020 | | 0.00 |
| **Future Residents/Applicants** | | | | | | | | | | | |
| 03110 | 4810-a3 | 769.00 | 00105000 | Antoine Lewis | 1,070.00 | 0.00 | 0.00 | 0.00 | 01/02/2020 | 01/31/2021 | | 0.00 |
| 06211 | 4810-a4g | 954.00 | 00102006 | Amanda Minter | 1,325.00 | 0.00 | 0.00 | 0.00 | 01/13/2020 | 02/01/2021 | | 0.00 |
| 18204 | 4810-b4 | 1,389.00 | 00105163 | micheal deen | 1,650.00 | 0.00 | 0.00 | 0.00 | 12/31/2019 | 01/31/2021 | | 0.00 |
| | Total | | Echelon at Monterrey Village(4810) | 353,780.00 | 266,693.09 | 8,000.00 | 0.00 | | | | -60,250.68 |

| Summary Groups | Square Footage | Market Rent | Actual Rent | Security Deposit | Other Deposits | # Of Units | % Unit Occupancy | % Sqft Occupied | Balance |
|---|---|---|---|---|---|---|---|---|---|
| Current/Notice/Vacant Residents | 260,520.00 | 353,780.00 | 266,693.09 | 8,000.00 | 0.00 | 240.00 | 83.75 | 82.37 | -60,250.68 |
| Future Residents/Applicants | | 4,045.00 | 0.00 | 0.00 | 0.00 | 3.00 | | | 0.00 |
| Occupied Units | 214,610.00 | 293,477.00 | | | | 201 | 83.75 | 82.37 | |
| Total Non Rev Units | 1,024.00 | 1,475.00 | | | | 1 | 0.41 | 0.47 | |
| Total Vacant Units | 44,886.00 | 58,828.00 | | | | 38 | 15.83 | 17.29 | |
| Totals: | 260,520.00 | 353,780.00 | 266,693.09 | 8,000.00 | 0.00 | 240 | 100.00 | 100.00 | -60,250.68 |

*EXHIBIT D*

*FORM OF DEED*

**RECORDING REQUESTED BY:**

**AFTER RECORDING, RETURN TO:**

Dornin Investment Group, LLC
1110 Glenneyre Street
Laguna Beach, California 92652
Attn.: Chris Dornin

_____

(Space Above For Recorder's Use Only)

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF BEXAR | § | |

THAT _____, a _____ (hereinafter referred to as "**Grantor**"), for and in consideration of the sum of TEN DOLLARS ($10.00) and other good and valuable consideration paid by the Grantee hereinafter named, the receipt and sufficiency of which is hereby acknowledged, has GRANTED, SOLD and CONVEYED, and by these presents does GRANT, SELL and CONVEY unto _____, a _____ (hereinafter referred to as "**Grantee**", whose address is _____), all of the following described property located in the District of _____, City of _____, _____ County, Texas, to-wit:

A tract of land containing _____ acres, more or less, being more particularly described on <u>Exhibit "A"</u> attached hereto and made a part hereof by this reference (hereinafter referred to as the "**Land**"); together with any and all improvements, appurtenances, rights, privileges and easements benefitting, belonging or pertaining to the Land and held by Grantor, and any right, title or interest of Grantor in and to any land lying in the bed of any street, road or highway in front of or adjoining the Land, together with any strips or gores relating to the Land (all of the foregoing being hereinafter collectively referred to as the "**Property**").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee, its successors and assigns

forever; and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND, all and singular, the Property unto the said Grantee's successors and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof, by, through or under Grantor, but not otherwise, excepting only those claims arising by reason of the conditions, covenants, restrictions, liens, encumbrances and other matters as are set forth on Exhibit "**B**" attached hereto and incorporated herein by reference.

*[Signatures on following page]*

EXHIBIT D
-2-

IN WITNESS WHEREOF, this Special Warranty Deed has been executed by Grantor on this ___ day of _____, 2020.

**GRANTOR:**

**WG MONTERREY VENTURE LLC**,
a Delaware limited liability company

By:     Garrett Partners IV, LLC
        an Indiana limited liability company,
        its Manager

        By:     _____
                Eric Garrett, Manager

STATE OF _____ _____          §
                                   §
COUNTY OF _____            §

This instrument was acknowledged before me this _____ day of _____, 2020, by Manager of Garrett Partners IV, LLC, an Indiana limited liability company, which is the Manager of WG Monterrey Venture LLC, a Delaware limited liability company, on behalf of said WG Monterrey Venture LLC.

[seal]

_____

Notary Public, State of Texas

Notary's printed name _____

Commission expires_____

Exhibit A to Exhibit F

Legal Description

EXHIBIT D
-4-

Exhibit B to Exhibit F

Title Exceptions

[*INSERT TITLE EXCEPTIONS FROM FINAL TITLE COMMITMENT*]

EXHIBIT D
-5-

*EXHIBIT E*

*FORM OF BILL OF SALE*

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, _____ ("**Seller**"), hereby conveys to _____ ("**Purchaser**"), all of Seller's right, title and interest in and to those certain items of personal property described on Exhibit A attached hereto and made a part hereof (the "**Personal Property**") relating to certain real property located at _____ _____.

Seller specifically does not make any express or implied warranty or representation with respect to the Personal Property, including, but not limited to, title, use, merchantability, fitness for any particular purpose; the design or condition of the Personal Property; the quality or capacity of the Personal Property; workmanship or compliance of the Personal Property with the requirements of any law, rule, specification or contract relating thereto; patent infringement; or latent defect.  Except as expressly stated herein, Purchaser accepts the Personal Property on an "**as is, where is**" basis.

IN WITNESS WHEREOF, Seller has caused this instrument to be executed and delivered as of this _____ day of _____, _____.

**SELLER:**

**WG MONTERREY VENTURE LLC**,
a Delaware limited liability company

By: Garrett Partners IV, LLC
   an Indiana limited liability company,
   its Manager

   By: _____
     Eric Garrett, Manager

# *EXHIBIT F*

## *FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES*

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, _____, having its principal office at 1051 Greenwood Springs Blvd., Suite 101, Greenwood, IN 46143 ("**Assignor**"), hereby sells, transfers, assigns and sets over unto _____, having its principal office at _____("**Assignee**"), its legal representatives, successors and assigns, all of Assignor's right, title and interest in, to and under (a) those certain leases referred to on *Exhibit A* attached hereto and made a part hereof (the "**Leases**") affecting the real estate legally described in the Agreement (as hereinafter defined) and commonly known as _____  _____,  _____  (the "**Property**"), and (b) the rent therein referred except, however, that portion of said rent attributable to periods of time prior to the Closing Date (as defined in that certain Agreement of Purchase and Sale by and between Assignor and Assignee, dated as of _____, _____(the "**Agreement**").

Assignee does hereby accept the foregoing Assignment and Assumption of Leases subject to the terms and conditions herein and in the Leases, and does hereby agree to perform, discharge, fulfill and observe all the obligations, terms, covenants, provisions and conditions under the Leases arising from and after the Closing Date.

Assignor agrees to protect, defend, indemnify and hold harmless Assignee, its legal representatives, successors and assigns from any and all losses, damages, expenses, fees (including, without limitation, reasonable attorneys' fees), court costs, suits, judgments, liability, claims and demands whatsoever in law or in equity, incurred or suffered by Assignee, its legal representatives, successors and assigns or any of them arising out of or in connection with the Leases as to events occurring prior to the Closing Date.

Assignee agrees to protect, defend, indemnify and hold harmless Assignor, its legal representatives, successors and assigns from any and all losses, damages, expenses, fees (including, without limitation, reasonable attorneys' fees), court costs, suits, judgments, liability, claims and demands whatsoever in law or in equity, incurred or suffered by Assignor, its legal representatives, successors and assigns or any of them arising out of or in connection with the Leases as to events occurring from and after the Closing Date.

Notwithstanding anything to the contrary contained in this Assignment and Assumption of Leases, it is expressly understood and agreed by and between the parties hereto that any liability of Assignee or Assignor hereunder shall be limited as set forth in the Agreement.

This Assignment and Assumption of Leases shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective beneficiaries, legal representatives, heirs, successors and assigns.

1190996/LA

This Assignment and Assumption of Leases may be executed and delivered in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Leases this _____ day of _____, _____.

**ASSIGNOR:**

**WG MONTERREY VENTURE LLC**,
a Delaware limited liability company

By:    Garrett Partners IV, LLC
an Indiana limited liability company,
its Manager

    By:   _____
          Eric Garrett, Manager

**ASSIGNEE:**

**DORNIN INVESTMENT GROUP, LLC**,
a Delaware limited liability company

By:   _____
      Chris Dornin, President

EXHIBIT F
-2-

*EXHIBIT G*

*FORM OF ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS*

*For valuab*le consideration, the receipt and sufficiency of which are hereby acknowledged, _____, having its principal office at 1051 Greenwood Springs Blvd., Suite 101, Greenwood, IN 46143 ("**Assignor**"), hereby sells, transfers, assigns and sets over to _____ (the "**Assignee**"), having its principal office at _____, and Assignee hereby assumes and accepts the assignment and delegation of all of Assignor's right, title and interest in and to the contracts described on ***Exhibit A*** attached hereto relating to certain real property located at _____, and Assignee hereby accepts such assignment and hereby assumes the performance of all of the terms, covenants and conditions imposed upon Assignor under said contracts accruing or arising on or after the date of this Assignment.

Assignor hereby covenants that Assignor will, upon written request, execute and deliver to Assignee or Assignee's successors, nominees or assigns (collectively, "**Assignee's Successors**"), any instruments as Assignee or Assignee's Successors may reasonably request in order to fully assign to Assignee or Assignee's Successors all Assignor's right, title, and interest in and to the contracts listed on Exhibit A hereto.

Assignor shall be responsible for and Assignee shall not be liable for any and all costs (including reasonable attorneys' fees and costs), damages, liabilities, claims, losses and causes of action incurred by or asserted against Assignee as a result of any failure to perform any obligation of Assignor under said contracts which accrued prior to the date of this Assignment.

Assignee shall be responsible for and Assignor shall not be liable for any and all costs (including reasonable attorneys' fees and costs), damages, liabilities, claims, losses, and causes of action incurred by or asserted against Assignor as a result of any breach by Assignee, from and after the date of this Assignment, of any of Assignee's obligations under the contracts listed on Exhibit A hereto.

Notwithstanding anything to the contrary contained in this Assignment and Assumption of Service Contracts, it is expressly understood and agreed by and between the parties hereto that any liability of Assignee or Assignor hereunder shall be limited as set forth in the Agreement.

This Assignment and Assumption of Service Contracts shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective beneficiaries, legal representatives, heirs, successors and assigns.

This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the date set forth below.

Executed as of this _____ day of _____, _____.

**ASSIGNOR:**

**WG MONTERREY VENTURE LLC**,
a Delaware limited liability company

By:    Garrett Partners IV, LLC
       an Indiana limited liability company,
       its Manager

       By:    _____
              Eric Garrett, Manager

**ASSIGNEE:**

**DORNIN INVESTMENT GROUP, LLC**,
a Delaware limited liability company

By:    _____
       Chris Dornin, President

### *EXHIBIT H*

### *GENERAL ASSIGNMENT OF INTANGIBLES*

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, _____, having its principal 1051 Greenwood Springs Boulevard, Suite 101, Greenwood, IN 46143 ("**Assignor**"), hereby sells, transfers, assigns and sets over unto _____, having its principal office at _____ ("**Assignee**"), its legal representatives, successors and assigns, all of Assignor's right, title and interest in and to:  (i) all freely assignable existing warranties and guaranties (express or implied) relating to the Improvements and the other Property other than any warranty or guarantee from The Garrett Construction Company, LLC; (ii) all assignable licenses, permits, certificates of occupancy, approvals, dedications, subdivision maps or plats, land sale registrations, property reports, conditional use permits, special use permits, declarations of non-significance, environmental impact statements and entitlements issued, approved or granted to or for the benefit of Seller or Seller's predecessors in interest by applicable governmental authorities or otherwise in effect and which relate to the Property, and including (without limitation) all assignable development rights and other intangible rights, titles, interests, privileges and appurtenances owned by Seller or Seller's predecessors-in-interest as owner of the Property and in any way related to or used in connection with the Property, (iii) all assignable trade names, logos, marks, trademarks, service marks, symbols and items of identification relative to the Property which are owned by Seller, (iv) all assignable licenses, consents, easements, rights of way and approvals required to make use of utilities and to ensure vehicular and pedestrian ingress and egress to the Property, and (v) all plans, drawings, specifications, surveys, engineering reports, and other technical descriptions, if any, relating to the construction of the Improvements and the other Property in Assignor's possession or control (collectively, the "**Intangibles**").

Notwithstanding the foregoing, this General Assignment of Intangibles expressly excluding the "**Echelon**" trademark, trade name and logo, web domain, and internet address, and any other trademark, trade name, logo, website, web domain or internet address that includes the term "**Echelon**."

This General Assignment of Intangibles shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective beneficiaries, legal representatives, heirs, successors and assigns.

This General Assignment of Intangibles may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same agreement.

All capitalized terms unless otherwise defined have the same meaning as set forth in that certain Purchase and Sale Agreement between Assignor and Assignee dated the ___ day of _____, _____.

IN WITNESS WHEREOF, the parties hereto have executed this General Assignment of Intangibles this _____ day of _____, _____.

**ASSIGNOR:**

**WG MONTERREY VENTURE LLC**,
a Delaware limited liability company

By:     Garrett Partners IV, LLC
        an Indiana limited liability company,
        its Manager

        By:     _____
                Eric Garrett, Manager

**ASSIGNEE:**

**DORNIN INVESTMENT GROUP, LLC**,
a Delaware limited liability company

By:     _____
        Chris Dornin, President

EXHIBIT H
-2-

***EXHIBIT I***

***FORM OF TENANT NOTICE***

(MONTH) (DATE), (YEAR)

_____

_____

_____

      Re:   NOTICE OF CHANGE OF OWNERSHIP

Dear Resident,

Effective (MONTH) (DATE), (YEAR), _____ has sold, assigned, and conveyed the property, a.k.a. [_____ Apartments, to _____, a _____.

The refundable deposit and/or refundable pet deposit that you paid in conjunction with your leased apartment home has been transferred to the new ownership for distribution in accordance to the terms and conditions set forth in your lease agreement.  All future rental payments with respect to your apartment lease agreement should continue to be paid on the 1st of each month directly to and made payable to _____.

Please feel free to contact the management office at _____ if you should have any questions.

Sincerely,

EXHIBIT I
-1-

# *EXHIBIT J*

## *FORM OF CERTIFICATE OF NON-FOREIGN STATUS*

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____, a _____ limited liability company ("**Seller**"), the undersigned hereby certifies the following on behalf of the Seller:

1.      Seller is not a foreign limited partnership as that term is defined in the Internal Revenue Code and Income Tax Regulations);

2.      Seller's U.S. employer identification number is _____; and

3.      Seller's address is _____.

Seller understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that it has examined this certification and to the best of its knowledge and believe it is true, correct and complete, and it further declares that it has authority to sign this document on behalf of Seller.

Dated: _____, _____

**SELLER:**

**WG MONTERREY VENTURE LLC**,
a Delaware limited liability company

By:     Garrett Partners IV, LLC
        an Indiana limited liability company,
        its Manager

        By:     _____
                Eric Garrett, Manager

1190996/LA

**EXHIBIT B**

**FIRST AMENDMENT TO PURCHASE AGREEMENT**

DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

25512837v.11 156571/00001

## FIRST AMENDMENT TO PURCHASE

This **FIRST AMENDMENT TO PURCHASE AGREEMENT** (this "**First Amendment**") is made and entered into as of January 27, 2020 (the "**Effective Date**"), by and between **WG MONTERREY VENTURE LLC,** a Delaware limited liability company ("**Seller**"), and **DORNIN INVESTMENT GROUP, LLC,** a Delaware limited liability company ("**Purchaser**").

## RECITALS

**WHEREAS**, Seller and Purchaser entered into that certain Purchase and Sale Agreement dated as of January 6, 2020 (the "**Purchase Agreement**"), relating to the sale of that certain real property located in the City of San Antonio, Texas, as more particularly described in the Purchase Agreement.  Capitalized terms used in this First Amendment and not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement; and

**WHEREAS**, Seller and Purchaser desire to amend the Purchase Agreement in certain respects as set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.      **Purchase Price**.  Section 2.1 of the Purchase Agreement is hereby amended and restated in its entirety and replaced with the following:

> *Purchase Price.*  The purchase price for the Property is Thirty Eight Million and 00/100 Dollars ($38,000,000.00) (the "**Purchase Price**").

2.      **Due Diligence Period.**  Section 4.3 of the Purchase Agreement is hereby amended and restated in its entirety and replaced with the following:

> *Due Diligence Period Defined*.  As used in this Agreement, the term "**Due Diligence Period**" means the period commencing upon the Effective Date and ending at 6:00 p.m.  Pacific Time on February 10, 2020.

3.      **Reserved.**

4.      **Closing**.  Section 9.1 of the Purchase Agreement is hereby amended and restated in its entirety and replaced with the following:

> *Time and Place.*  The consummation of the transaction contemplated hereby ("**Closing**") shall be completed through an escrow with Title Insurer on the date that occurs thirty (30) days following the expiration of the Due Diligence Period) (the "**Closing Date**").  Notwithstanding the foregoing, Purchaser shall have the

right upon written notice to Seller delivered not later than five (5) business days prior to the originally scheduled Closing Date to extend the Closing for one period of fifteen (15) days upon depositing with the Title Insurer the sum of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) (together with all interest earned thereon, the "**Extension Deposit**") on or prior to the Closing.   The Extension Deposit shall be immediately non-refundable, except as otherwise set forth herein.   The Extension Deposit shall apply to the Purchase Price.

5.        **Reserved**.

*6.*        **Service Contracts**.  This Amendment shall serve as notice to Seller that Purchaser will not assume any of the Service Contracts, other than the contract for provision of cable, internet, phone and/or telecommunications services to the Property a copy of which is attached as *Exhibit K* to the Purchase Agreement.

7.        **Limited Waiver of Right to Terminate.**

(a)        For the purposes hereof, the "**Tax Contingency**" shall be deemed to have been satisfied if, and only if, Seller obtains a final determination from the applicable court/agency (i.e. Bexar County real property tax appraisal review board, the Texas State office of Administrative Hearings, or a district court of competent jurisdiction) valuing the Land and Improvements for the tax year 2019 at an amount equal to or less than $35,000,000 with no more than $929,788 of taxes due for such period.

(b)        Purchaser hereby acknowledges that it hereby waives its right to terminate pursuant to Section 4.6 of the Purchase Agreement; provided, that, for the avoidance of doubt, the foregoing waiver shall not affect Purchaser's right to terminate in connection with (i) the failure of Seller to satisfy the Tax Contingency on or before the expiration of the Due Diligence Period; or (ii) as provided in Section 3.2 of the Purchase Agreement.  Other than as expressly provided herein, the foregoing waiver shall in no event affect any of the other rights of Purchaser under the Purchase Agreement.

8.        **Counterparts**.  This First Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together will constitute one and the same instrument.  The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto except having additional signature pages executed by other parties to this First Amendment attached thereto.

9.        **Ratification**.  Seller and Purchaser hereby ratify and confirm all of their obligations under the Purchase Agreement.  Except as set forth in this First Amendment, all of the terms and provisions of the Purchase Agreement shall remain unmodified and in full force and effect.

10.        **Electronic Signatures**.  Seller and Purchaser each (i) have agreed to permit the use of facsimile or other electronic signatures in order to expedite the execution of this First Amendment, (ii) intends to be bound by its respective facsimile or other electronic signature,

(iii) is aware that the other will rely on such facsimile or other electronically transmitted signature, and (iv) acknowledges such reliance and waives any defenses to the enforcement of this First Amendment based on the fact that a signature was sent by facsimile or electronic transmission only.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties hereto have executed this First Amendment as of the date and year hereinabove written.

**SELLER:**

**WG MONTERREY VENTURE LLC,**
a Delaware limited liability company

By: Garrett Partners IV, LLC
   an Indiana limited liability company,
   its Manager

   By: _____
      Eric Garrett, Manager

**PURCHASER:**

**DORNIN INVESTMENT GROUP, LLC,**
a Delaware limited liability company

By: _____
  Chris Dornin, President